# EXHIBIT B



## State of Connecticut Judicial Branch
# Superior Court Case Look-up



**FBT-CV23-5050779-S**  **V. V. INDIVIDUALLY AND AS NEXT FRIEND TO MINOR C.O v. META PLATFORMS INC**

**Prefix:** FB3    **Case Type:** T90    **File Date:** 01/24/2023    **Return Date:** 03/07/2023

| Case Detail | Notices | History | Scheduled Court Dates | E-Services Login | Screen Section Help | ▶ |

To receive an email when there is activity on this case, click here. ⧉

Superior Court Case Look-up
- Civil/Family
- Housing
- Small Claims
-
Attorney/Firm Juris Number Look-up ⧉
-
Case Look-up
- By Party Name
- By Docket Number
- By Attorney/Firm Juris Number
- By Property Address
-
Short Calendar Look-up
- By Court Location
- By Attorney/Firm Juris Number
- Motion to Seal or Close
- Calendar Notices
-
Court Events Look-up
- By Date
- By Docket Number
- By Attorney/Firm Juris Number
-
Legal Notices
-
Pending Foreclosure Sales ⧉
-
Understanding
Display of Case Information
-
Contact Us

Comments

**Information Updated as of:** 03/01/2023

| Case Information |
|---|

**Case Type:** T90 - Torts - All other
**Court Location:** BRIDGEPORT JD
**List Type:** No List Type
**Trial List Claim:**
**Last Action Date:** 02/27/2023  (The "last action date" is the date the information was entered in the system)

| Disposition Information |
|---|

**Disposition Date:**
**Disposition:**
**Judge or Magistrate:**

| Party & Appearance Information |
|---|

| Party | | No Fee Party | Category |
|---|---|---|---|
| **P-01**  **V. V. INDIVIDUALLY AND AS NEXT FRIEND TO MINOR C.O.** | | | Plaintiff |
| **Attorney:** KENNEDY JOHNSON SCHWAB & ROBERGE LLC (106077)  555 LONG WHARF DRIVE  13TH FLOOR  NEW HAVEN, CT 06511 | File Date: 01/24/2023 | | |
| **P-02**  **E. Q. INDIVIDUALLY AND AS NEXT FRIEND TO MINOR C.O.** | | | Plaintiff |
| **Attorney:** KENNEDY JOHNSON SCHWAB & ROBERGE LLC (106077)  555 LONG WHARF DRIVE  13TH FLOOR  NEW HAVEN, CT 06511 | File Date: 01/24/2023 | | |
| **D-01**  **META PLATFORMS INC**  Non-Appearing | | | Defendant |
| **D-02**  **SNAP INC**  Non-Appearing | | | Defendant |

| D-03 | **SNAPCHAT LLC** | Defendant |
| | Non-Appearing | |
| D-04 | **REGINALD SHARP** | Defendant |
| | Non-Appearing | |
| D-05 | **EDDIE RODRIGUEZ** | Defendant |
| | Non-Appearing | |

**Viewing Documents on Civil, Housing and Small Claims Cases:**

If there is an 🌐 in front of the docket number at the top of this page, then the file is electronic (paperless).

- Documents, court orders and judicial notices in electronic (paperless) civil, housing and small claims cases with a return date on or after January 1, 2014 are available publicly over the internet.* For more information on what you can view in all cases, view the Electronic Access to Court Documents Quick Card.

- For civil cases filed prior to 2014, court orders and judicial notices that are electronic are available publicly over the internet. Orders can be viewed by selecting the link to the order from the list below. Notices can be viewed by clicking the **Notices** tab above and selecting the link.*

- Documents, court orders and judicial notices in an electronic (paperless) file can be viewed at any judicial district courthouse during normal business hours.*

- Pleadings or other documents that are not electronic (paperless) can be viewed only during normal business hours at the Clerk's Office in the Judicial District where the case is located.*

- An Affidavit of Debt is not available publicly over the internet on small claims cases filed before October 16, 2017.*

*Any documents protected by law Or by court order that are Not open to the public cannot be viewed by the public online And can only be viewed in person at the clerk's office where the file is located by those authorized by law or court order to see them.

| Motions / Pleadings / Documents / Case Status | | | | |
|---|---|---|---|---|
| Entry No | File Date | Filed By | Description | Arguable |
| | 01/24/2023 | P | SUMMONS 📝 | |
| | 01/24/2023 | P | COMPLAINT 📝 | |
| | 01/24/2023 | P | ADDITIONAL PARTIES PAGE 📝 | |
| 101.00 | 01/24/2023 | P | EX PARTE APPLICATION FOR PERMISSION TO USE PSEUDONYM(S) 📝 *RESULT:* Granted 1/24/2023 HON CHARLES REED | Yes |
| 101.10 | 01/24/2023 | C | ORDER 📝 Granting Ex Parte Pseudonyms/Sealing Lodged Docs. *RESULT:* Order 1/24/2023 HON CHARLES REED | No |
| 102.00 | 01/24/2023 | C | ORDER HEARING AND NOTICE 📝 | No |

*RESULT:* Order 1/24/2023 BY THE CLERK

| 103.00 | 01/24/2023 | P | **MOTION TO SEAL DOCUMENT** 📄 | Yes |
| 104.00 | 01/24/2023 | C | **ORDER PERMITTING USE OF PSEUDONYM(S)** 📄 | Yes |
| | | | *RESULT:* Order 1/24/2023 BY THE CLERK | |
| 105.00 | 01/26/2023 | P | **MOTION FOR ORDER** 📄 | No |
| | | | Motion for Permission for Continuing Use of Pseudonym | |
| 106.00 | 02/02/2023 | P | **RETURN OF SERVICE** 📄 | No |
| 107.00 | 02/27/2023 | P | **SUPPLEMENTAL RETURN** 📄 ❗NEW | No |

| Scheduled Court Dates as of 02/28/2023 |
|---|
| **FBT-CV23-5050779-S - V. V. INDIVIDUALLY AND AS NEXT FRIEND TO MINOR C.O v. META PLATFORMS INC** |

| # | Date | Time | Event Description | Status |
|---|---|---|---|---|
| 1 | 03/27/2023 | 2:15PM | Remote Hearing | Proceeding |

Judicial ADR events may be heard in a court that is different from the court where the case is filed.  To check location information about an ADR event, select the **Notices** tab on the top of the case detail page.

Matters that appear on the Short Calendar are shown as scheduled court events on this page. The date displayed on this page is the date of the calendar.

The status of a Short Calendar matter is not displayed because it is determined by markings made by the parties as required by the calendar notices and the civil standing orders. Markings made electronically can be viewed by those who have electronic access through the Markings History link on the Civil/Family Menu in E-Services. Markings made by telephone can only be obtained through the clerk's office. If more than one motion is on a single short calendar, the calendar will be listed once on this page. You can see more information on matters appearing on Short Calendars by going to the Civil/Family Case Look-Up page and Short Calendars By Juris Number or By Court Location.

Periodic changes to terminology that do not affect the status of the case may be made.

This list does not constitute or replace official notice of scheduled court events.

**Disclaimer:** For civil and family cases statewide, case information can be seen on this website for a period of time, from one year to a maximum period of ten years, after the disposition date. If the Connecticut Practice Book Sections 7-10 and 7-11 give a shorter period of time, the case information will be displayed for the shorter period. Under the Federal Violence Against Women Act of 2005, cases for relief from physical abuse, foreign protective orders, and motions that would be likely to publicly reveal the identity or location of a protected party may not be displayed and may be available only at the courts.

Attorneys | Case Look-up | Courts | Directories | EducationalResources | E-Services | FAQ's | Juror Information | News & Updates | Opinions | Opportunities | Self-Help | Home

Common Legal Terms | Contact Us | Site Map | Website Policies

https://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=FBTCV235050779S                                                3/4

Copyright © 2023, State of Connecticut Judicial Branch

Page Created on 3/1/2023 at 6:46:08 PM

**SUMMONS - CIVIL**
JD-CV-1  Rev. 2-22
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact a court clerk or go to: www.jud.ct.gov/ADA. |
|---|



State of Connecticut
Post Date: 01/24/2023
Payfile: 23...
STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov
Docket: CV235050779S
Receipt Nbr: 0388231

**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.
☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.
☐ Select if claiming other relief in addition to, or in place of, money or damages.

List Total:  001  $360.00

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk (Number, street, town and zip code) | Telephone number of clerk | Return Date (Must be a Tuesday) |
|---|---|---|
| **1061 Main Street, Bridgeport, CT  06604** | **( 203 ) 579 − 6527** | **03-07-2023** |

| ☒ Judicial District | G.A. | At (City/Town) | Case type code (See list on page 2) | |
|---|---|---|---|---|
| ☐ Housing Session | ☐ Number: ___ | **Bridgeport** | Major: **T** | Minor: **90** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented (Number, street, town and zip code) | Juris number (if attorney or law firm) |
|---|---|
| **Kennedy Johnson Schwab & Roberge, 555 Long Wharf Drive, 13th Floor, New Haven, CT  06511** | **106077** |

| Telephone number | Signature of plaintiff (if self-represented) |
|---|---|
| **( 203 ) 865 − 8430** | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. ☒ Yes  ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book (if agreed) |
|---|---|
| | **mkennedy@kennedyjohnson.com** |

| Parties | | Name (Last, First, Middle Initial) and address of each party (Number; street; P.O. Box; town; state; zip; country, if not USA) | |
|---|---|---|---|
| **First plaintiff** | Name: | **V.V. Individually and as next friend to minor C.O., c/o Attorney Michael Kennedy** | P-01 |
| | Address: | **555 Long Wharf Drive, 13th Floor, New Haven, CT  06511** | |
| **Additional plaintiff** | Name: | **E.Q. Individually and as next friend to minor C.O., c/o Attorney Michael Kennedy** | P-02 |
| | Address: | **555 Long Wharf Drive, 13th Floor, New Haven CT** | |
| **First defendant** | Name: | **META PLATFORMS, INC. 1601 Willow Rd, Menlo Park, CA 94025 c/o AFS: Corporation ServiceCompany** | D-01 |
| | Address: | **Goodwin Square, 225 Asylum Street, 20th Floor, Hartford, CT  06103** | |
| **Additional defendant** | Name: | **SNAP, INC., c/o Secretary of Snap, Inc., pursuant to C.G.S.A. Section 33-929** | D-02 |
| | Address: | **2772 Donald Douglas Loop, North, Santa Monica, CA  90405** | |
| **Additional defendant** | Name: | **SNAPCHAT, LLC, 3000 31st St., Santa Monica, CA 90405 c/o AFS: Corporation Service Company** | D-03 |
| | Address: | **Goodwin Square, 225 Asylum Street, 20th Floor, Hartford, CT  06103** | |
| **Additional defendant** | Name: | **SHARP, REGINALD, c/o Cheshire Correctional Institution** | D-04 |
| | Address: | **900 Highland Avenue, Cheshire, CT 06410** | |

| Total number of plaintiffs: 2 | Total number of defendants: 5 | ☒ Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date | Signed (Sign and select proper box) | ☒ Commissioner of Superior Court | Name of person signing |
|---|---|---|---|
| **01/24/2023** | | ☐ Clerk | **Michael R. Kennedy** |

| If this summons is signed by a Clerk: | | For Court Use Only |
|---|---|---|
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts. | File Date | |
| b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law. | | |
| c. The court staff is not permitted to give any legal advice in connection with any lawsuit. | | |
| d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the summons, or the service of the summons or complaint. | | |

| I certify I have read and understand the above: | Signed (Self-represented plaintiff) | Date | Docket Number |
|---|---|---|---|
| | | | **CV235050779** |

## Instructions

1. Type or print legibly. If you are a self-represented party, this summons must be signed by a clerk of the court.
2. If there is more than one defendant, make a copy of the summons for each additional defendant. Each defendant must receive a copy of this summons. Each copy of the summons must show who signed the summons and when it was signed. If there are more than two plaintiffs or more than four defendants, complete the Civil Summons Continuation of Parties (form JD-CV-2) and attach it to the original and all copies of the summons.
3. Attach the summons to the complaint, and attach a copy of the summons to each copy of the complaint. Include a copy of the Civil Summons Continuation of Parties form, if applicable.
4. After service has been made by a proper officer, file the original papers and the officer's return of service with the clerk of the court.
5. Use this summons for the case type codes shown below.

   Do *not* use this summons for the following actions:
   (a) Family matters (for example divorce, child support, custody, parentage, and visitation matters)
   (b) Any actions or proceedings in which an attachment, garnishment or replevy is sought
   (c) Applications for change of name
   (d) Probate appeals
   (e) Administrative appeals
   (f) Proceedings pertaining to arbitration
   (g) Summary Process (Eviction) actions
   (h) Entry and Detainer proceedings
   (i) Housing Code Enforcement actions

## Case Type Codes

| MAJOR DESCRIPTION | CODE Major/ Minor | MINOR DESCRIPTION |
|---|---|---|
| Contracts | C 00 | Construction - All other |
| | C 10 | Construction - State and Local |
| | C 20 | Insurance Policy |
| | C 30 | Specific Performance |
| | C 40 | Collections |
| | C 50 | Uninsured/Underinsured Motorist Coverage |
| | C 60 | Uniform Limited Liability Company Act – C.G.S. 34-243 |
| | C 90 | All other |
| Eminent Domain | E 00 | State Highway Condemnation |
| | E 10 | Redevelopment Condemnation |
| | E 20 | Other State or Municipal Agencies |
| | E 30 | Public Utilities & Gas Transmission Companies |
| | E 90 | All other |
| Housing | H 10 | Housing - Return of Security Deposit |
| | H 12 | Housing - Rent and/or Damages |
| | H 40 | Housing - Housing - Audita Querela/Injunction |
| | H 50 | Housing - Administrative Appeal |
| | H 60 | Housing - Municipal Enforcement |
| | H 90 | Housing - All Other |
| Miscellaneous | M 00 | Injunction |
| | M 10 | Receivership |
| | M 15 | Receivership for Abandoned/Blighted Property |
| | M 20 | Mandamus |
| | M 30 | Habeas Corpus (extradition, release from Penal Institution) |
| | M 40 | Arbitration |
| | M 50 | Declaratory Judgment |
| | M 63 | Bar Discipline |
| | M 66 | Department of Labor Unemployment Compensation Enforcement |
| | M 68 | Bar Discipline - Inactive Status |
| | M 70 | Municipal Ordinance and Regulation Enforcement |
| | M 80 | Foreign Civil Judgments - C.G.S. 52-604 & C.G.S. 50a-30 |
| | M 83 | Small Claims Transfer to Regular Docket |
| | M 84 | Foreign Protective Order |
| | M 89 | CHRO Action in the Public Interest - P.A. 19-93 |
| | M 90 | All other |

| MAJOR DESCRIPTION | CODE Major/ Minor | MINOR DESCRIPTION |
|---|---|---|
| Property | P 00 | Foreclosure |
| | P 10 | Partition |
| | P 20 | Quiet Title/Discharge of Mortgage or Lien |
| | P 30 | Asset Forfeiture |
| | P 90 | All other |
| Torts (Other than Vehicular) | T 02 | Defective Premises - Private - Snow or Ice |
| | T 03 | Defective Premises - Private - Other |
| | T 11 | Defective Premises - Public - Snow or Ice |
| | T 12 | Defective Premises - Public - Other |
| | T 20 | Products Liability - Other than Vehicular |
| | T 28 | Malpractice - Medical |
| | T 29 | Malpractice - Legal |
| | T 30 | Malpractice - All other |
| | T 40 | Assault and Battery |
| | T 50 | Defamation |
| | T 61 | Animals - Dog |
| | T 69 | Animals - Other |
| | T 70 | False Arrest |
| | T 71 | Fire Damage |
| | T 90 | All other |
| Vehicular Torts | V 01 | Motor Vehicles* - Driver and/or Passenger(s) vs. Driver(s) |
| | V 04 | Motor Vehicles* - Pedestrian vs. Driver |
| | V 05 | Motor Vehicles* - Property Damage only |
| | V 06 | Motor Vehicle* - Products Liability Including Warranty |
| | V 09 | Motor Vehicle* - All other |
| | V 10 | Boats |
| | V 20 | Airplanes |
| | V 30 | Railroads |
| | V 40 | Snowmobiles |
| | V 90 | All other |
| | | *Motor Vehicles include cars, trucks, motorcycles, and motor scooters. |
| Wills, Estates and Trusts | W 10 | Construction of Wills and Trusts |
| | W 90 | All other |

RETURN DATE: MARCH 7, 2023

V.V. and E.Q., individually and as next friends
to minor C.O.

                    Plaintiff(s),

v.

META PLATFORMS, INC., formally known
as FACEBOOK, INC.; SNAP, INC.;
SNAPCHAT, LLC; REGINALD SHARP; and
EDDIE RODRIGUEZ

SUPERIOR COURT OF
CONNECTICUT

J.D. OF FAIRFIELD
AT BRIDGEPORT

JANUARY 24, 2023

"In these digital public spaces, which are privately owned and tend to be run
for profit, there can be tension between what's best for the technology
company and what's best for the individual user or for society. Business
models are often built around maximizing user engagement as opposed to
safeguarding users' health and ensuring that users engage with one another
in safe and healthy ways. . . . Technology companies must step up and take
responsibility for creating a safe digital environment for children and youth.
Today, most companies are not transparent about the impact of their products,
which prevents parents and young people from making informed decisions
and researchers from identifying problems and solutions."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (Dec. 7, 2021)

"Tweens are herd animals ..."

*Tweens and Social Media,* Meta Platforms, Inc. (Oct. 9, 2017)

## COMPLAINT

Plaintiffs V.V. and E.Q., individually and as next of friends to minor C.O., bring this action

against Meta Platforms, Inc.  ("Meta"), formally known as Facebook, Inc. (operating as

"Facebook" and "Instagram"), Snap, Inc. and Snapchat, LLC (collectively, "Snap")

(operating as "Snapchat") (collectively, "Social Media Defendants"), Reginald Sharp, and

1

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

Eddie Rodriguez (collectively, "Defendants") for personal injuries caused to each by said Defendants and as follows:

## I.    INTRODUCTION

1.    This lawsuit seeks to hold the Social Media Defendants' products responsible for causing and contributing to the burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by the Social Media Defendants and, specifically, for the harms they caused to 15-year-old C.O. and her family beginning when she was only 10 years old. Defendant Meta and Snap's design, programming and operation of their social media products, failures to warn, marketing and distribution of their products to C.O., and C.O.'s subsequent exposure to and use of those products directly and proximately caused the harms at issue in this Complaint, which include but are not limited to addiction (a/k/a problematic use), sleep deprivation, anxiety, depression, self-harm, suicidal ideation, exploitation and abuse, and attempted suicide. This lawsuit further seeks to hold Defendants Snap, Reginald Sharp ("Sharp"), and Eddie Rodriguez ("Rodriguez") liable for the more specific and discreet (but still significant) harms they caused to C.O. in 2019 and 2021, after Defendant Snap designed a user recommendation algorithm (known as "Quick Add"), then programmed and implemented that product in a manner likely to affirmatively "Add" and connect predators (including convicted sex offenders) to the accounts of minor children – which is precisely what happened to C.O.

2.    On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises in the United States between the years of 2009 and 2019, including anxiety, depression, self-harm, attempted suicides, suicides, eating disorders, and inpatient admissions. While the most significant and far-reaching change to the lives of young people during that same period was the launch and

2

light speed growth of certain social media platforms, most prominently for purposes of this

lawsuit, the Instagram (launched in 2010) and Snapchat (launched in 2011) products.

    3.      Plaintiffs' harms were directly and proximately caused by the actions and

decisions of these Social Media Defendants, which should come as no surprise to Defendants

Meta or Snap. From the outset, both companies set out to exploit vulnerabilities in human

psychology to addict users and maximize user time and engagement. Meta's first President,

Sean Parker summed it up in a 2017 interview,

> God only knows what it's doing to our children's brains. The thought process
> that went into building these applications, Facebook being the first of them,
> ... was all about: "How do we consume as much of your time and conscious
> attention as possible?" And that means that we need to sort of give you a little
> dopamine hit every once in a while, because someone liked or commented on
> a photo or a post or whatever. And that's going to get you to contribute more
> content, and that's going to get you ... more likes and comments. It's a social-
> validation feedback loop ... exactly the kind of thing that a hacker like myself
> would come up with, because you're exploiting a vulnerability in human
> psychology. The inventors, creators ... understood this consciously. And we
> did it anyway.[1]

    4.      Peer reviewed studies and available medical science have recently begun

identifying a causal relationship between the use of the Meta and Snap social media products

and severe mental health harms to children, including but not limited to teen suicide, suicide

risk factors, depression, anxiety, and other serious harms – many of the harms suffered by

C.O. and at issue in this Complaint. More to the point, over the last decade, Meta and Snap's

own internal observations and studies also identified the risks and harms their products and

product features were causing to minor users. Both of these social media defendants knew

or should have known that they their actions and decisions relating to the Facebook,

Instagram, and Snapchat products were causing harm to some significant number of their

---

[1] Mike Allen, Sean Parker unloads on Facebook: "God only knows what it's doing to our children's brains", Axios (November 9, 2017), https://www.axios.com/2017/12/15/sean-parker- unloads-on-facebook-god-only-knows-what-its-doing-to-our-childrens-brains-1513306792.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

minor users, and yet they failed to take action to proect the health and well-being of their minor users. More than that, Meta and Snap spent the last decade convincing children, parents, governments, and the general public that their social media products – Facebook, Instagram, and Snapchat – are not addictive or otherwise harmful to children and that they use all available technologies to prevent distribution of their products to convicted sex offenders and drug dealers, to enforce their terms of service, and to otherwise provide a safe and fun environment for their youngest users.  These assurances were deliberately false or materially misleading.

5.    The level to which these Social Media Defendants prioritized profits over foreseeable and known harms to human life is unprecedented; and, in all cases, the harms to C.O. and her family could and would have been avoided but for their unilateral and undisclosed product marketing, design, distribution, and programming decisions.

6.    Meta and Snap have invested billions of dollars to design, develop, distribute, and market their products to engage and retain the youngest possible audience, including,

  a. (as against Meta and Snap) Targeting minors in the marketing of their products, and known distribution to children under 13 and to children under 18 absent parental consent;

  b. (as against Meta and Snap) Marketing and making other public characterizations about their products that are materially false or misleading, for example, advertising features to portray the product as fun and harmless while withholding from advertising and other disclosures features likely to cause harm to children, claiming that their products are not addictive when they have actual knowledge to the contrary, and claiming that they utilize all available technologies to ensure the safety of kids when they do not;

c.  (as against Meta and Snap) Designing, implementing, and making available and/or utilizing products that are defective and/or inherently dangerous in connection with minor users, for example, direct messaging products, public profile settings, disappearing and inherently dangerous and/or misleading messaging products and options, and hidden data vaults;

d.  (as against Meta and Snap) Designing, programming, and operating their user recommendation products to identify, encourage, and affirmatively connect minor users with other users (often adults), which affirmative connections Meta and Snap know to be problematic, inappropriate, harmful, and highly detrimental to the mental and physical health of their minor users;

e.  (as against Meta only, at this time and pending discovery against Snap) Designing, programming, and operating its products group and content recommendation products to identify, encourage, and affirmatively connect minor users with user groups and subject matters (referred to as content when discussed on a piece-by-piece basis) in a manner that Meta knows or should know to be problematic, inappropriate, harmful, and highly detrimental to the mental and physical health of their minor users;

f.  (as against Meta only, at this time and pending discovery against Snap) Continued operation of proprietary algorithms without disclosure and despite knowledge that these products suffer an algorithmic bias and/or algorithmic discrimination defect, that is, where Meta's design, programming and/or operational decisions are affirmatively directing disproportionately higher amounts of violent, sexual, and other harmful and unwanted subject matters

5

to vulnerable users and/or protected classes, including children, women, persons of color, and low socio-economic status ("low-SES");

g. (as against Snap only) Continued operation of the "Quick Add" and, possibly, other proprietary algorithm products without disclosure and despite the fact that Snap knew or should know that these products suffer from a severe algorithmic discrimination defect – namely, that Snap's design, programming and/or operational decisions are resulting in Snap's provision of certain user recommendation and account viewing services to male users and adult female users that bear almost no resemblance to the same types of services Snap provides to young female users, resulting in Snap providing inherently dangerous and discriminatory services to young female users based on Snap's determinations and assumptions regarding their age and gender;

h. (as against Meta and Snap) The design and sending of communications, such as push notifications and emails, to minor users in the user's state of residence, where Meta and Snap have designed and send such notifications and direct communications in excess and at inherently harmful times of day to encourage and compel minor users to continue using their products (even after the user had already chosen to not use said product); and

i. (as against Meta and Snap) Designing, distributing, programming, and operating their products in a manner designed to create and encourage addiction in young users in other ways, some of which are known and set forth herein and in the documents attached and others of which are unknown to anyone but Meta and Snap but will be revealed in discovery in this case.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

7.     Meta and Snap have designed their platforms around sunk cost and network effect principles and continue to implement and program and/or operate numerous product features in manners they know to be dangerous to young users, which designs and decisions are not known to ordinary and reasonable consumers.  Meta and Snap understand the cost to these minor users which is why many (if not most) of their principals and designers severely restrict and/or prohibit the use of these products by their own children. Plaintiffs can think of no other industry where product manufacturers have avoided responsibility for marketing and distributing products to kids that they are too afraid to let their own kids use; much less while repeatedly representing to the public and even to Congress in sworn testimony (as Defendants Meta and Snap have done) that their products are not addictive, and that they utilize all available technologies to keep kids safe.

8.     Strict Product Liability – Design Defect. Plaintiffs bring claims against Defendants Meta and Snap for strict liability based upon the defective design of their products that render such products not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decreases both the incidence and magnitude of harm to minors arising from their foreseeable use of Meta and Snap's products with a negligible increase in production cost. Meta and Snap simply chose profits over safety.

9.     Strict Product Liability – Failure to Warn.  Plaintiffs bring claims against Defendants Meta and Snap for strict liability based on their failure to provide adequate warnings to minor users and their parents of the dangers of mental, physical, and emotional harms and sexual abuse arising from the foreseeable use of their products as currently designed, distributed, and operated by Meta and Snap. The addictive quality of these social media products and the impacts of Meta and Snap's harmful product designs and features,

7

including but not limited to their user, group, and subject matter recommendation algorithms and programming decisions, direct messaging products and messaging options and public profile features, disappearing messaging and secret data vault products, hidden rewards products, and others, are unknown to minor users and their parents.

10.     <u>Negligence – Design Defect and Failure to Warn</u>.  Plaintiffs bring claims for common law negligence against Defendants Meta and Snap arising from their unreasonably dangerous social media products and their failure to warn of such dangers. Meta and Snap knew, or in the exercise of ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to redesign their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products.

11.     <u>Connecticut Unfair Trade Practices Act, C.G.S. §§ 42-110g, et seq.</u> ("CUTPA").  Plaintiffs bring claims against Defendants Meta and Snap for committing unfair and/or deceptive acts or practices by marketing and representing their products as being safe for minor users when Meta and Snap knew or should have known that their social media products were harmful to a significant percentage of their minor or users yet they failed to redesign their products to limit the potential harms or warn minor users and their parents of the dangers inherent in the foreseeable use of their products.  The unfair and/or deceptive acts or practices of Defendants Meta and Snap were a proximate cause of the harm suffered by the plaintiffs, C.O. and her parents.

12.     <u>Unjust Enrichment</u>. Plaintiffs also bring a claim for unjust enrichment against Defendants Meta and Snap. Meta and Snap received a direct benefit from problematic and harmful use of their product, as well as the opening of accounts by C.O.'s parents under the (mistaken but reasonable) belief that they could utilize those accounts to help monitor or

8

protect their child online. Under the circumstances, it would be unjust and inequitable for Meta and Snap to retain those ill-gotten benefits.

13.    <u>Invasion of Privacy</u>.    Plaintiffs bring claims for invasion of privacy. Defendants' conduct detailed herein frustrated and intruded upon Plaintiff J.P.'s fundamental right to protect her child and to monitor and control her use of social media, and this intrusion occurred in a manner that was highly offensive to a reasonable person.

14.    <u>Negligence</u>. Plaintiffs also bring a claim of negligence against Meta and Snap for their failures in preventing a C.O., a minor user of Defendants' products, from interacting with adult users, for failing to take adequate preventative measures to keep minor users free from sexual exploitation, assault, and battery at the hands of adult users; by permitting adult users to freely interact with minor users of their products when Defendants knew, or should have known that minor users were at risk of sexual exploitation, assault, and battery through the use of Defendants' products; by affirmatively connecting minor female users with adult male users thereby increasing the risk that minor users would be sexually exploited, assaulted, or battered; by failing to establish, maintain and enforce a policy of reporting, investigating, and removing users engaged in sexual misconduct or exploitation; and/or by failing to recognize the risks that adult users were using Defendants' products to sexually exploit, assault and batter minor users such as C.O.

15.    <u>Assault and Battery</u>. Plaintiffs also bring claims against Reginald Sharp for his sexual exploitation, assault and battery of the minor plaintiff, who was introduced to this defendant exclusively through her use of Snapchat.

16.    <u>Assault and Battery</u>. Plaintiffs also bring claims against Eddie Rodriguez for his sexual exploitation, assault and battery of the minor plaintiff, who was introduced to this defendant exclusively through her use of Snapchat.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

## II.     PARTIES

17.     Plaintiffs V.V. and E.Q. are C.O.'s parents and legal guardians. C.O. currently is 15 years old and began suffering harms caused by the Facebook, Instagram, and Snap products when she was only 10.

18.     V.V. and E.Q. have not entered into a User Agreement or other contractual relationship with any of the Defendants herein in connection with C.O.'s use of their social media products, and further disaffirm all agreements that their child may have entered with Defendants. As such, Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in any such agreements.

19.     Defendant Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta owns and operates the Facebook and Instagram social media platforms, products Meta distributes and makes widely available to users in the State of Connecticut.  At all times relevant hereto, Defendant Meta was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Meta.

20.     Defendants Snap, Inc. and Snapchat, LLC (collectively "Snap") are Delaware and Nevada corporations, respectively, with their principal places of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, a product Snap distributes and makes widely available to users in the State of Connecticut. At all times relevant hereto Defendant Snap was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Snap.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

21.     Defendant Reginald Sharp is an invidual who currently resides at the Cheshire Correctional Institution located in Cheshire, Connecticut.

22.     Defendant Eddie Rodriguez is an individual who currently resides at the Hartford Correctional Center, located in Hartford, Connecticut.

### III.    JURISDICTION AND VENUE

22.     This Court has personal jurisdiction over Defendants Meta and Snap because both defendants transact business in Connecticut with Connecticut residents, Plaintiffs' claims set forth herein arise out of and relate to Defendants Meta and Snap's activities in the State of Connecticut, and Meta and Snap have purposefully availed themselves of the benefit of transacting business in Connecticut with Connecticut residents. For example, both Meta and Snap advertise and encourage use of the products at issue in this lawsuit in Connecticut; enter into millions of contracts with Connecticut residents, including as relating to use of the same social media products; provide access to significant percentages of Connecticut's population to its social media product; generate and send emails and other communications to Connecticut residents, including to C.O.; design and distribute push notifications, recommendations, and other communications to Connecticut residents, aimed at encouraging addiction and use of Meta and Snap's social media products, as Meta and Snap did here; actively and extensively collect personal and location information belonging to Connecticut residents, including C.O.; and generate revenue from Connecticut activities that dwarf what most Connecticut-based businesses generate.

23.     Defendant Meta and Snap also will not stop doing business in Connecticut or bar Connecticut residents from use of their media products. The revenue these defendants generate because of Connecticut users and because defendants' business model relies on being able to distribute their products to and enter into product-related contracts and

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

transactions with Connecticut residents (including children) is too significant. Walling off distribution and sales to Connecticut would have a devastating impact on Meta and Snap's entire business, irrespective of their total number of users and locations worldwide.

24.     Plaintiffs are residents of Connecticut and Defendants Meta and Snap distributed and C.O. acquired and used Defendants' products in Connecticut, and Plaintiffs suffered injuries here as a result.

25.     On information and belief, Defendants Reginald Sharp and Eddie Rodriguez are residents of the state of Connecticut.

26.     Venue is proper in this county because Plaintiffs reside here.

## IV.    FACTUAL ALLEGATIONS

27.     In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). While the Facebook Papers originate from Meta, they discuss the Snapchat product and establish how certain of Meta and Snapchat's technologies operate, thus proving known dangerous designs and design defects as well as other dangers caused by the Snap's social media product as well.[2]

---

[2] Facebook papers have been published at various sources, including but not limited to https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/, https://gizmodo.com/facebook-papers-how-to-read-1848702919, and other publishers as referenced herein, and were disclosed to the SEC, Congress, and others on a global scale. Plaintiffs expressly incorporate all such documents into this Complaint by reference, which are material to certain of Plaintiffs' allegations.

12

28.     Meta and Snap know about the harms their products cause users, particularly to teen, child, and other vulnerable user populations. And yet, both companies have made deliberate decisions to continue operating their products in this harmful and dangerous matter, as a means of competing with one another and to increase their already astronomical profits. Meta is simply the only one whose documents have been disclosed; even then, Plaintiffs anticipate literal truckloads of *additional* evidence that will support their claims.

29.     Defendants Meta and Snap are making calculated cost-benefit decisions and are consistently prioritizing their already astronomical profits over human life.

**A.     Meta and its Facebook and Instagram Products**

30.     Meta, founded in 2004, is the world's largest social media company, and its motto until recently was "Move Fast and Break Things," while Instagram began as a simple photo-sharing application, which Meta purchased in 2012.

31.     When Meta began, access to its products were limited to college students, with email and/or domain verification to confirm the same. Then, in September 2006, Meta opened Facebook up to everyone. It claimed that it provided access only to persons 13 and older, and that users under 18 should obtain parental consent. But it also stopped verifying age or identity, as well as things like a valid email address and/or birthdate (for example, underage users currently can enter nonsense email addresses and input inconsistent birthdate information across multiple accounts, and Meta will still make its product available to them). These product changes were good for Meta's bottom line but resulted in the complete absence of any guardrails for children and teens.

32.     In 2009, Meta launched its "like" button product and, in 2011, it launched Facebook Messenger. By 2012, when Meta acquired the Instagram social media product, Meta was making rapid and significant changes to all of its social media products – including

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

Facebook and Instagram – focused on ramping up its marketing to teens and increasing engagement at any cost. This included product changes, and changes in data collection and advertising policies and procedures; essentially any change Meta could think up that might bolster engagement and revenue, particularly among children and teens, and create greater addiction and network effects features to ensure that those users would be locked-in to its social media products for years to come – but at the expense of user safety and autonomy.

33.     Meta understood that children and teens would be key to its long-term growth and ability to compete with emerging social media products like like Snapchat and TikTok. With this in mind, Meta ramped up its marketing to children and teens in the U.S. It designed new products and re-designed several establish ones, launched emojis and games, and became significantly more involved with creation content; in 2016, Meta launched a product feature making it easier for kids to hide accounts and switch between accounts on a single device; and when Meta realized that teens were opening secondary, secret accounts—referred to as FINSTAs (Fake Instagram) or SPAM accounts—Meta undertook a concerted effort to make sure that all teens knew they could open secret accounts on Instagram.

34.     In short, Meta did whatever it needed to do to hook as many young users as possible. It did this despite actual knowledge that developmental differences between minors and adults made minor users more vulnerable and, in fact, specifically exploited such vulnerabilities for its own economic gain. One illustrative example can be found in the Meta document titled *The Power of Identities: Why Teens and Young Adults Choose Instagram*,[3] where Meta wrote,

> The teenage brain is usually about 80% mature. The remaining 20% rests in
> the frontal cortex [...] At this time teens are highly dependant on their

---

[3]https://www.documentcloud.org/documents/23322855-copy-of-copy-of-why-teens-and-young-adults-choose-insta_sanitized p. 49-65 ("Teen Fundamentals").

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

temporal lobe where emotions, memory and learning, and the reward system reign supreme […] Teens' decisions and behavior are mainly drive by emotion, the intrigue of novelty and reward … while these all seem positive, they make teens veru vu;nerable at the elevated levels they power on. Especially in the absence of a mature frontal cortez to help impose limits on the indulgence in these.[4]



Recognizing such developmental differences, Meta's document goes on to identify various "Opporunities" – that is, product design and development changes Meta can use to exploit these vulnerabilities in its youngest users. Examples include but are not limited to,

- "Invent new interaction types that produce a feeling of shared experience …"

- "incorporating more lower quality content in their [teen's] discovery experiences"

- "streamline multiple account creation …"

---

[4] *Id.* at p. 51-52.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

- "Up-rank feel good teen interest content over aspirational content …"[5]



35.     Throughout these product changes, re-designs, and launches, Facebook founder and CEO, Mark Zuckerberg, made public statements to families in Connecticut and around the world that safety was Meta's top priority. For example, in February of 2017, he made a post on his personal Facebook titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Facebook is for bringing communities together, promoting critically important social groups, and other statements that we now know to be untrue, and profoundly dangerous, given what was actually happening at Facebook and what Mr. Zuckerberg knew about the harms his products were causing American youth.

---

[5] *Id.* at p. 54-56.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

36.    For example, by 2017—when Mr. Zuckerberg published his manifesto—Meta employees already were reporting to management that Meta's social media products were causing harmful dependencies; Meta was studying and purposefully designing its products in a manner that required sunk cost and system effects that would ensure its ability to lock-in its young users – that is, to make sure that they would never leave; Meta was marketing to children under 18, as well as children under 13 (despite clear legal mandates that it could not knowingly allow children under 13 on its social media products); and Meta leadership, Mark Zuckerberg himself, was actively rejecting proposed re-designs and fixes that would have minimized harms Meta's products were actively causing to children and teen users, users like minor C.O.  Another Meta document (*Facebook's Frankenstein Moment*, published internally on September 24,2017) includes multiple employee comments detailing product safety steps Meta leadership deliberately skipped, avoided, or ignored and false representations made to the public when users inevitably were harmed as a result,[6]



---

[6]https://www.documentcloud.org/documents/23322867-copy-of-facebook_s-frankenstein-moment_sanitize_opt, p. 1, 17, 26-27, 30.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077



*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

> I am late to the game here, but this made my heart so happy. I work on the Content Policy team, our job is to think of the worst of the worst ways people will behave and express themselves on our platform, and we're increasingly partnering with new products on their rules and systems pre-launch. But the MOST frustrating thing is not being listened to and then hearing these stories come out. My team consulted for Live, not only did we anticipate murders and suicides at Live, we anticipated far worse (all but one of our top 5 predictions came true, in fact). But it still took over a year post-launch (after these horrible incidents happened) to get most of the tools that we were begging for from the start to operate. And all along we kept hearing that no one could have [...]

37.     In short, Meta's assurances to consumers and the government were false. Meta's statements were designed to lull parents and users into a false sense of security, despite Meta's own knowledge of the harms its products were causing – which harms were not known and could not be discovered by reasonable consumers. Meta leadership knew what it was doing, but was operating under the misguided belief that they would not get caught – and but for the 2021 whistleblower, they may have gotten away with it!

38.     Meta creates images and GIFs for users to post on their videos and pictures in connection with its Facebook and Instagram products, and has acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post. The GIFs, images, and music are integral to the user's post and are designed to encourage posting; indeed, in many cases, the only content in a user's post is the image, GIF or music Meta supplies. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

Meta's internal documents, that decision was motivated by the fact that such collaboration results in increased engagement, advertising revenue, and other profits for Meta itself. Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all.

39.    Meta's Facebook and Instagram products are used by many millions of children every day, children who have become addicted to these products by design.

**B.    Snap and its Snapchat Product**

40.    Snapchat is an American social media company founded in 2011, by three Stanford college students, Evan Spiegel, Bobby Murphy, and Reggie Brown. Evan Spiegel, who thanks to Snapchat, became the world's youngest billionaire, remains CEO today.

41.    Snap develops and maintains the wildly popular Snapchat, Spectacles, and Bitmoji technology products, among others.

42.    Snapchat, originally called *Picaboo*, began as a simple smartphone-based product premised on disappearing messages, a feature that remains foundational to its popularity. The founders developed the disappearing idea off their own pain point because they faced condemnation and regret for a spate of horribly crude and misogynistic emails they sent within their fraternity, which would be leaked years later.[7] They also wanted an easier way to convince wary coeds to send them nudes. Months after its launch, *Picaboo* had amassed only 127 users[8] so the trio "pivoted" with a name change to Snapchat and began marketing to and targeting high school students. Within a year, and with its new target audience of children and teens, Snapchat grew to more than 100,000 users.

---

[7] https://valleywag.gawker.com/fuck-bitches-get-leid-the-sleazy-frat-emails-of-snap-1582604137
[8] https://frozenfire.com/history-of-snapchat/

*Kennedy, Johnson, Schwab & Roberge, L.L.C. • ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

43.    The Snapchat product is best-known for its self-destructing content feature, which allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients.[9]  The sender sets a dial for how long they want the recipient to be able to see the image before it deletes and if the recipient screenshots the image, the sender gets a pop-up notification,

> Snapchat was started at a time when everybody and their mom thought they were an entrepreneur who could launch a successful social app. Facebook was where you went for updates on family and friends, Instagram was beautiful photo content, and Twitter was the conversation at a cocktail party. These three social giants dominated most of the conversation, but they all played off of each other in terms of functionality, and, most importantly, audience. However, Snapchat was able to counterbalance the strengths of all three players and create a new social pipeline.

> The norm of the internet age is to create platforms in which everything is saved—everything is stored and documented digitally. Snapchat went the opposite direction ...[10]

44.    Since its inception in 2011 Snap's leadership designed and re-designed new product features in what became an epic race with competing social media manufacturers to increase popularity among America's youth and secure the title of go-to app for tweens, teens, and young adults. Snap is known within the industry for being an innovator whose product ideas other companies like Defendant Meta steal. ("Many of the features we now see baked into every social app originated from Snapchat.").[11] The following is a product

---

[9] https://www.garyvaynerchuk.com/the-snap-generation-a-guide-to-snapchats-history/. Snap attributes much of its popularity among "younger social media users" to this feature. *See* https://www.thestreet.com/technology/history-of-snapchat ("in a 2013 interview with *The Telegraph*, Spiegel honed in on the real reason Snapchat was such a hit with younger social media users – they didn't want their social media history coming back to haunt them.").

[10] https://www.garyvaynerchuk.com/the-snap-generation-a-guide-to-snapchats-history/

[11] https://www.visualcapitalist.com/timeline-looking-back-at-10-years-of-snapchat/;          *see       also* https://www.businessinsider.com/guides/tech/vanish-mode-instagram?amp (Instagram did not implement its Vanish Mode feature until "late 2020," and the feature is one that must be selected by the user, rather than the default).

21

innovation timeline, illustrating Snap's evolution over time from a simple product to one
with several different (and dangerous) product features,[12]



45.     In 2012, Snapchat launched on Android and added video capabilities, pushing
the number of "snaps" to 50 million per day.[13]

46.     In 2013, Snap added its "Chat" and "Stories" features – skyrocketing Snap's
popularity among American youth and "changing the face of social media timelines

---

[12] https://www.visualcapitalist.com/timeline-looking-back-at-10-years-of-snapchat/
[13] https://www.thestreet.com/technology/history-of-snapchat

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

forever"[14] This same year, Instagram launched Instagram Direct in an effort to compete with Snapchat's photo messaging platform; and in response to *that*, Snap launched filters, timestamps, temperature and speed overlays, and Snap replays.[15]

47.     In 2014, Snap added text conversations, live video chat capabilities, "Our Story," Geofilters, and Snapcash.  Chat allowed users to talk to one another in the chat window via live video chat,[16] which feature also is appealing to predators as it means no evidence – no call logs or text message trails that can be used by parents or the police. Snap does not limit use of that product, or any of these products, to adult users.  Snap also does not widely advertise these products, such that most parents do not know they exist.

48.     By 2015, Snapchat had over 75 million monthly active users and was the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform. Snap then introduced Discover ("a fun and interactive source of content from media partners such as National Geographic, Comedy Central, CNN, and more"),[17] QR code incorporation, and facial recognition software, and began its monetization strategy. Snap also launched several "hilarious animated selfie

---

[14] *Id.*; *see also, e.g.,* https://www.visualcapitalist.com/timeline-looking-back-at-10-years-of-snapchat/ ("... the concept of **stories** is perhaps the most significant contribution to the digital landscape. Disappearing short-form videos started off as a messaging tool, but ended up transforming the way people share their lives online."); *see also, e.g.,* https://www.garyvaynerchuk.com/the-snap-generation-a-guide-to-snapchats-history/ ("This update marked Snapchat's first big move into becoming a major platform by creating its own social language and context. It already had functionality very different from any other social network at the time ... But after Stories the platform began to take off and mature as a content destination."); https://businesschief.com/digital-strategy/curious-history-snapchat-and-its-increasing-importance-businesses ("parents and other members of older generations have a dominant presence on Facebook, causing younger users to seek out a new platform. Snapchat came on the scene at just the right time.").

[15] https://frozenfire.com/history-of-snapchat/

[16] https://www.thestreet.com/technology/history-of-snapchat

[17] https://www.garyvaynerchuk.com/the-snap-generation-a-guide-to-snapchats-history/ (the Discover product put Snap "in a very aggressive place within the overall user interface of the app and delivers an unmatched form of attention from their youthful user base.").

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

lenses" in 2015.[18]  Advertisements were now a huge source of Snap's revenue – according to company financials, they made up 99% of total revenue.[19]

     49.     In 2016, Snap introduced Memories, Groups, and the My Eyes Only self-destructing data vault product. The same year, Instagram launched its own "Stories" product, directly copying from the Snapchat Stories product Snap introduced back in 2013 and due to how wildly popular Stories proved to be with teens and young adults.[20]

     50.     Snap also markets and advertises specifically to minors. For example, one popular Snapchat commercial highlights fun filters, appealing to children and teens,



---

[18] https://www.thestreet.com/technology/history-of-snapchat
[19] Id.
[20] See, e.g., https://frozenfire.com/history-of-snapchat/; https://www.visualcapitalist.com/timeline-looking-back-at-10-years-of-snapchat/

Another one features toys (a ghost and robot) entering a Snaps booth, and series of goofy photo booth photos,



51.    Snapchat offers several unique messaging and data features, and is most famous for its self-destructing content design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous product feature both because it deprives parents of any way to monitor or control usage by their children – seemingly a blatant violation of Section 230(d) – but also, because it encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with what they believe to be a safe and efficient vehicle to recruit victims. Snapchat has become the go-to application for sexual predators because of these product features,[21] and adult predators often will encourage or convince children to open Snapchat accounts and/or provide them with their Snapchat account usernames so that they can utilize Snap's product in this way.

---

[21] *See, e.g.*, https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

52.    For years Snap has received reports of child abuse and bullying occurring through its product and because of its product features,[22] yet has kept those features in place as removing them would result in considerable impact on the popularity of Snap's social media product.  Harmful and dangerous interactions likewise occur because of these and other Snapchat messaging features, which provide direct and unsupervised access to children and teens. But also, Snapchat is a dangerous product because it does not operate as advertised. Snap's disappearing design and marketing of this feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos – and are often bullied, exploited, and/or sexually abused as a direct result.

53.    By 2021, Snap employed 5,661 people and made 4.12 billion in revenue; by Q2 2022, Snapchat had 347 million daily active users worldwide and an average of over 5 billion Snaps are sent every day.[23] Snapchat is now one of the most widely used social media products in the world and is used by more than 69% of all U.S. teens (age 13 to 17).[24] Snap itself estimates having between 92.8 and 96.6 million users in the U.S., at least 17 to 17.7 million of which are under the age of 18. Against this backdrop, Snap advertises and promotes its product as safe and fun—which could not be further from the truth.

54.    Snap has developed images for users to decorate the pictures or videos they post, Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video content

---

[22] *See, e.g.,* https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/?sh=411b8e1d399a (Snapchat Has Become A 'Haven for Child Abuse' With Its 'Self-Destructing Messages').
[23] https://thesocialshepherd.com/blog/snapchat-statistics
[24] *See* https://www.smartinsights.com/social-media-marketing/social-media-strategy/snapchat-statistics/

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

that its users can incorporate in the pictures and videos they post on Snapchat. These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content; and when malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Snap's platform. Moreover, Snap contracts for legal rights in this third-party content, such that it is not "third-party content" at all. *See, e.g.*, Snap's Terms of Service.

55.  The Snapchat product is used by many millions of children every day, children who have become addicted to the product by design.

**C.  Meta and Snap Designed and Distributed Inherently Dangerous and/or Defective Products to Minors and Failed to Warn**

56.  Facebook, Instagram, and Snap contain countless features that serve no critical purpose relating to product functionality.

57.  While this Complaint addresses known features, on information and belief, there are other features and technologies designed, developed, manufactured, operated, and distributed by Meta and Snap that currently are unknown to Plaintiffs for the simple reason that these defendants have concealed the truth and operate with zero transparency. Plaintiffs believe that they will identify other examples of harmful product features and conduct

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

through discovery in this case and, as such, it is in the interest of the State of Connecticut for this Court to permit discovery on these issues.

### Design and Distribution Decisions that Interfere with Parental Control and Consent

58.    Meta and Snap claim to impose age restrictions for use of their products, including that users must be at least 13 and must (in the case of Snap) or should (in the case of Meta) obtain parental consent if under 18.  Nevertheless, Meta and Snap provide access to millions of minors who are under 13 or under 18 and lack parental consent.  Meta and Snap know that they are providing unauthorized access and provide it anyway.  For example, only, Meta utilizes technologies that ascertain the actual age of each user with reasonable certainty (referred to as approximate or estimated age). Meta uses its technology and the resulting findings for assessment and advertising purposes, then ignores those same findings with regard to use of its product by persons under 13. Whereas, Snap does not stop distributing its product even when it has actual notice of no parental consent, such as after the filing of a Complaint, and at least not until Snap has no other choice.

59.    Snap and Meta also design their products to encourage and aid users' evasion of parental oversight—such as with Defendant Snapchat's self-destructing content design feature, which product feature Meta has now made optional on its own products—and do not notify parents concerning the amount of time their children spend on their platforms, what hours of the day they are connected, or when they are contacted or solicited by adults. Defendants also do not verify emails or phone numbers, permit and encourage multiple accounts (with the knowledge that children use these multiple account features to hide accounts from their parents), and refuse to enforce their age limitations in any reasonable or meaningful manner.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

**Profile and Accessibility Settings**

60.    Defendant Meta's public profile settings and Defendant Snap's equivalent are inherently dangerous and defective when utilized in connection with minor users.

61.    These types of settings and product features allow strangers to identify, view, and contact underage users not already on their friend list – that is, complete strangers who these children do not know in real life or even virtually. While Meta and Snap have determined that such access to minor users (all users, really) is good for their engagement, they also know that they are exposing children to strangers in a manner against which parents cannot protect. Meta and Snap could set all minor accounts to private by default or, even better, they could restrict all minor accounts to private until the user reaches the age of majority in his, her, or their state.

62.    Public default settings are unnecessary and serve no critical purpose as to product functionality or a user's ability to access content posted by other users.  They do, however, encourage and provide adult users the ability to identify and access minors for the purpose of sexual abuse and exploitation—a dangerous defect known to Meta and Snap.

**Direct Messaging Products and Features**

63.    Meta and Snap's direct messaging products are inherently dangerous and defective when utilized in connection with minor users.

64.    Meta and Snap's direct-messaging products provide other users—including anonymous and semi-anonymous adult users, bullies under the age of eighteen, and any other stranger for whom a parent would not allow access—with unrestricted and unsupervised access to minor users. Minor users lack the cognitive ability and life experience to identify online grooming behavior by prurient adults and the psychosocial maturity to decline

*Kennedy, Johnson, Schwab & Roberge*, L.L.C. • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

invitations to exchange salacious material and mass-messaging capabilities. These products further allow direct messaging with and by minors without parental notification.

65.    At all times relevant, Defendant Meta (and, on information and belief, Defendant Snap) have actual knowledge that these products are harming minors, and opt to design and distribute for engagement regardless. One example can be found in the Facebook paper titled *How should we default new teens into new interactions settings?: a survey of safety and value.* In this document (date uncertain), Meta employees acknowledge that "Building a safer account model is the right thing to do," that "Restricted interaction settings can shield people from UI [Unwanted Interactions]," and that "[Direct Messages] DM's are where most unwanted interactions (UI) happen, especially for new teen users." Despite these truths, Meta ultimately decided to not make simple product changes—i.e. not defaulting new teens into a product seting that would prevent them from receiving DMs from users they don't follow—because such changes would likely result in some measure of decreased engagement among teens.[25]

---

[25]https://www.documentcloud.org/documents/23322914-copy-of-should-we-default-teens-into-privacy-settings__sanitized_opt; p. 3, 10-12, 23.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077





31

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077





66.    Meta and Snap's direct messaging products are unnecessary and serve no critical purpose as to product functionality. They are, however, incredibly profitable in terms of engagement and retention of teen users; as well as engagement and retention of adult users who want access to vulnerable children and teens outside the purview of their parents. Meta and Snap could restrict direct messaging products so that minor users could not use them, or so that they could only send or receive direct messages with persons approved by their parents and/or already on their "friend" list or equivalent.

67.    Moreover, Defendants Meta and Snap now have various modes of direct messaging, including things like Live Audio and Video Chats, which further endanger minor users and make it impossible for parents to monitor their children.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

## **User Recommendation Product**

68.    Defendants Meta and Snap employ user recommendation technologies (often referred to as algorithms), affirmatively selecting and sending recommendations to users regarding people and/or groups they should "friend," join, or otherwise connect. Snap calls its algorithm "Quick Add," while Meta calls its algorithm "People You May Know" (on its Facebook product) and "Suggestions for You" (on its Instagram product). ). Whatever the name, these technologies and specific products function by taking user data and other information obtained through Defendants' data collection technologies (including information such as age, gender, on-platform and off-platform activities, usage history, habits, interactions with others, and countless other data points) and then uses that information to identify and affirmatively direct users to one another via recommendations that the users connect, follow, friend, add, or otherwise.

69.    These user recommendation products are good for Meta and Snap's engagement, including because they help users connect with other users with whom they otherwise would not connect.

70.    At the same time, however, these user recommendation products are dangerous *because* Meta and Snap have opted both to utilize them in connection with minor accounts and to design, program, and operate them for engagement over safety. Defendants' business decisions in this regard have aided, facilitated, and otherwise contributed to a signicant amount of the adult/minor grooming and exploitation that has occurred on their platforms, and including those at issue in this Complaint.

71.    The way Defendants' technologies work (under their <u>current programming choices</u>) effectively reward predatory users for past success. That is, the more  success a user has exploiting and abusing minors, the more the Facebook, Instagram, and Snap products

*Kennedy, Johnson, Schwab & Roberge, L.L.C. • ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

reward them. Take for example a user who has historically, and successfully, targeted young (under 14) and vulnerable female users.[26]  In this scenario, Meta and Snap's technologies recognize and are programmed to act on the fact that optimal engagement is served by finding that predator more young and vulnerable female users—irrespective of the harms to those users resulting  in more the same.  While this may sound like an extreme result, it is precisely what Defendants are doing to minor users!

72.     Employee comments to a Meta document titled *Growth, Friending + PYMK, and downstream integrity problems* prove the point.  As a Meta employee explains,

> I had been collecting instances of friending contributing to harms. The most interesting ones I had found were,
>
> - **IIC / Grooming – In the past, PYMK contributed up to 75% of all inappropriate adult-minor contact**.
> - Autolikers – In Vietnam, PYMK was a key channel for Autoliker Agents to find targets
> - For High-Profile Impersonation, PYMK was a common method to connect users and HPIs

Another Meta employee responded: "how on earth have we not just turned off PYMK between adults and children? … it's really, really upsetting."[27]  Again, PYMK is Meta's "friend recommendations" algorithm, utilized by Meta in its Facebook and Instagram social

---

[26] Meta collects so much information about every user (as well as non-users) that it is able to identify young girls with certain characteristics in a matter of seconds; for example, excessive usage, late night usage, certain number of "friends," emotional posts, and/or other factors and usage patterns Meta has programmed its system to recognize and, thus, categorize for purposes of identifying things like loneliness and/or insecurities and/or lack of parental oversight. In short, Meta is able to hand pick for its predators the most vulnerable of its young users and because Meta leadership refuses to program guardrails into its algorithms, its systems see nothing wrong with doing so. On the contrary, Meta has programmed its technology to equate increased engagement with success, regardless of the cost to its youngest and most vulnerable users.

[27] https://s3.documentcloud.org/documents/23322845/friending-and-pymk-downstream-integrity-problems.pdf, p. 4 (emphasis added); copy attached as Exhibit A.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

media products (referred to as "People you May Know" and "Suggestions for You" respectively), which product functions essentially the same as Snap's "Quick Add."

73.     More to the point, Meta and Snap knew about these products and their programming of these products, while the U.S. government and consumers did not; and they knew that their design, distribution, and programming decisions were causing and/or contributing to the abuse and exploitation of millions of children.

74.     In addition to connecting predators with kids, Defendant Snap has implemented further product designs that actively assist predators in finding children in real life. For example, Snapchat allowed users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. Likewise, the Snapchat product allows users to identify friends of friends near them. At all times relevant, Snap made these features available to all users, including minors. These product features has directly contributed to stalking and other, physical harms and assaults perpetrated on minors, and these are harms known or should be known to Defendant Snap.

75.     Further, Meta and Snap's design, programming, and distribution of these products—as described above—discriminate against young, female users. That is, and as will be illustrated by the facts specific to C.O. (along with countless other young women), Meta and Snap targeted C.O. with harmful connections and/or content because of her gender. There are connections and content they would not have directed at her otherwise and did not direct to similarly situated teen boys. Meta and Snap operated their products despite knowledge of this algorithmic discrimination and millions of young women in the U.S., including C.O., have suffered as direct and proximate result.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

## Content Recommendation Products

76.    Defendants Meta and Snap also employ content recommendation algorithms, affirmatively flooding the Discover, News Feed, Explore, and other product surfaces to which they have addicted young users with content they select to habituate users to the Facebook, Instagram, and Snapchat products. These technologies create addiction in minor users on a content-neutral basis by adapting to promote whatever content will trigger minor users' engagement and maximize their screen time.

77.    More currently is known about the Meta content recommendation products, due to the Facebook whistleblowers disclosures in late 2021. However, on information and belief, Snap also utilizes content recommendation algorithms, which products it began offering during times at issue in this Complaint. More discovery is needed as to content algorithms utilized by Snap.

78.    Both the Facebook and Instagram products show users a "feed." A user's "feed" is comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Meta. Meta exerts complete control over a user's "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In other words, Meta is programming its own targeted advertisements and algorithms in a manner that is causing harm to millions of its users, and harmed C.O.

79.    Over time, Meta made the cost-benefit decision to slowly switch its News Feed in ways that Meta later determined and confirmed as harmful to its users. For example, Meta switched from maximizing time-spent to maximizing sessions, even though it has since

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

determined that maximizing sessions can lead to and cause unhealthy dependencies – particularly among children, teens, and young adults. Meta also made the cost-benefit decision to not program for user safety, even in the case of young users.

80.    Meta's programming decisions and product designs, *i.e.* recommendation-based feeds and product features, promote harmful content ranging from massive amounts of negative social comparison content to shocking and outrageous content such as hate speech, pornography, child and animal abuse, and even live suicides and/or the glorification of suicide and self-harm among children and teens. Again, Meta is aware of the impact its programming decisions are having on its youngest users, it simply does not care enough to prioritize user safety over its own revenue and growth objectives.

81.    Instagram also has a search feature, called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Again, Meta designed and operates its product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the purpose of continued growth, engagement, and revenue increase.

82.    Instagram has also added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories." These products were developed to appeal specifically to minor users, and Meta knows that they contribute to problematic use and other harms suffered by minor users from use of the Instagram product. To name one example, Meta failed to implement standard product features in its Stories product, which reduced the safety of that product to

the detriment of a significant percentage of its users – including and primarily minors and persons of color.

83.    There are tens of thousands if not millions of additional Meta documents and data sources that the world will need to see to fully appreciate and understand how Meta's products function and what Meta (and Snap) has knowingly done to minors. Moreover, Meta could make its products exponentially safer for children, teens, and young adults through any number of quick and inexpensive changes. To name only a few examples,

a.    Meta currently programs its recommendation technologies to prioritize engagement but could program those technologies instead (either generally or specific to accounts used by minors) to prioritize safety.

b.    Meta chooses the speed at which it runs its algorithms and knows that its chosen speed has significant impact on problematic use and resulting sleep deprivation. Meta has analyzed but refused to make small changes to its product speed which, if made at a set time each evening in the case of every account used by minors, would exponentially reduce the difficulties minor users have stopping their use at night and to sleep.

c.    Meta could slow, restrict, or even stop entirely its use of recommendation technologies in connection with minor accounts, any one of which would significantly reduce harms to minor users at nominal cost to Meta.

d.    Meta could collect less or different data from minor users and/or utilize less or different data in connection with minor users, which unilateral changes would significantly reduce harms to minor users at nominal cost to Meta.

e.    Meta could stop approving harmful advertisements and/or restrict or limit the types and frequency of advertisements it directs to minor users, which

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

unilateral changes would significantly reduce harms to minor users at nominal cost to Meta.

84.     Meta and Snap's content recommendation technologies also serve no countervailing benefit to consumers. Users are perfectly capable of running their own searches, as they do with any number of available search engines. And if the harmful third-party content were being provided in that manner – *i.e.* if this was content requested and sought out by users as opposed to content identified and force fed to users as means to make Meta and Snap more money – it would not be at issue in this case

85.     Meta is exerting a degree of manipulation and control over its users via their unchecked technologies that far exceeds anything the world could have contemplated even a decade ago. Meta regularly "experiments" on users—users with no idea that they are being monitored and examined—to test product ideas, but also, to identify mechanisms through which Meta can control user behavior for its own profit. Meta is not targeting millions, thousands, or even hundreds of users in this manner. Instead, its technologies allow it to target every single user simultaneously and on an individual basis, which fact makes its algorithmic and social media products far more dangerous than other products. Additionally, Meta and Snap's programming decisions are aimed to encourage and cause dependencies and harmful levels of use of their products.

### Push Notifications and Emails

86.     Meta and Snap's push notifications and emails encourage addictive behavior and are designed specifically to increase use of their Facebook, Instagram, and Snapchat products.

87.     Push notifications are clickable, pop-up notifications that Defendants Meta and Snap "push" to users after they have logged off their products, and specifically to pull

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

them back and persuade them to continue using. Meta and Snap have put significant time and thought into the wording of those notifications, designing and re-designing them over time and to make them more effective. A former Meta developer outlined that "the vast majority of push notifications are just distractions that pull us out of the moment… They get us hooked on pulling our phones out and getting lost in a quick hit of information that could wait for later, or doesn't matter at all."[28]  Meta and Snap also target young users with email and other forms of communication, where they have access to such information.

88.    Meta and Snap's notifications to individual users are specifically designed to, and do, prompt them to open Meta and Snap's social media products and view the content Meta and Snap select, thereby increasing sessions and profits to defendants. Meta and Snap draft and decide on the language of these notifications. More to the point, even the format of their notifications have been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing. For example, instead of telling a user what someone on their "friends" list said, Meta and Snap will create and push a vague and enticing message to the user to maximize the likelihood that the user will log back onto its product. Meta and Snap create and send messages like "There are comments on [your friend]'s post you may have missed." The wording of these notifications is deliberate.

89.    Meta and Snap target young users with these notifications and send them to young users in the state of Connecticut at all hours of the day and night – including during school and sleeping hours, when those notifications cause the most harm. The average

---

[28] Justin Rosenstein, co-creator of Facebook's Like Button, in Julian Morgans 2017 "The Secret Ways Social Medials Built for Addiction" Vice https://www.vice.com/en/article/vv5jkb/the-secret-ways-social-media-is-built-for-addiction

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

American consumer, for example, receives an estimated 56 push notifications each day[29] while (on information and belief) Meta and Snap send more of these notifications to minor users than they do to the average American consumer.

### Marketing to Kids, Social Comparison, and Other Addictive Product Features

90.    Defendants Meta and Snap incorporate several unique product features that serve no functional purpose, but that do make their products more appealing to children and teens (*i.e.*, "likes" and filters, avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (*i.e.*, "likes" and filters).

91.    One example involves extensive testing Defendant Meta performed on its "like" button feature. Meta determined that its "like" product feature is a source of social comparison harm for many of its users. This is not surprising given that several of the Meta employees involved in creating that feature have since left Meta and have spoken publicly about the product's addictive nature and harmfulness.[30] What is surprising, however, is that Meta identified the harmful feature (the "like" button) and ran experiments (called "Project Daisy") to see whether hiding the feature completely (called, "Pure Daisy") would reduce the harms, found that it would in fact reduce the harms and in statistically significant numbers when it came to teen users, then made the business decision to *not* launch Pure Daisy for fear that hiding "likes" would result in lower engagement and anger advertisers. Meta leadership chose profit over the health and well-being of teens.

---

[29] *See* Martin Pielot, Amalia Vradi, and Souneil Park. 2018 "Dismissed! A detailed exploration of how mobile phone users handle push notifications" Proceedings of the 20th International Conference on Human-Computer Interaction with Mobile Devices and Services https://doi.org/10.1145/3229434.3229445; *see also* Olivia Rudgard 2022 "Stop sending children social media notifications during the night, says privacy expert" The Telegraph https://www.telegraph.co.uk/news/2018/03/22/stop-sending-children-social-media-notifications-night-says/.

[30] *See, e.g.*, https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

41

92.     Facebook, Instagram, and Snapchat also are designed around a series of features that do not add to the communication utility of the applications, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards. Examples of this in the Facebook and Instagram products include but are not limited to features like "likes," "followers," algorithm-controlled feed, and unlimited scrolling features; examples of this in the Snapchat product include but are not limited to features like Snap's series of rewards, including trophies, streaks, and other signals of social recognition, recommendation technologies, and unlimited scrolling features.

93.     The Snap Streak feature is unique to Defendant Snap's product and is one of the most – if not the most – addictive products available especially to teenagers." Snap knows that its Snap Streak product is addictive and has known for years but continues to provide that product to teens and children.

94.     Each of the above products, design, distribution, and programming decisions are dangerous alone, but they are substantially more dangerous when combined. For example, Meta and Snap's direct-messaging products are more dangerous when coupled with minor accounts of which parents have no knowledge (or means to monitor) and do not consent; and when combined with Defendants' public profile and recommendation features.

95.     Meta and Snap deliberately designed their products this way to increase engagement; employed invasive, surreptitious means to operate these technologies; failed to warn users or their parents of these dangers known only to Defendants; and refused to restrict their use of these products in connection with minors' accounts or otherwise make these products safe, despite knowledge of the harms perpetrated on American youth in general and on Plaintiffs in particular. The cost of designing safer products and fixing known defects

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

is negligible. In fact, each of the above examples could be addressed in a matter of hours, not days. These products serve no purpose for consumers, and the benefit of making the necessary changes would be high in terms of reducing the quantum of mental and physical injury sustained by minor users and their families.

**D.    Meta and Snap's Business Models are Based on Maximizing User Screen Time**

96.    Meta and Snap advertise their products as "free" because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

97.    The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

98.    Meta and Snap use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Meta and Snap know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

99.    Meta and Snap have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

the most advanced computer algorithms and artificial intelligence available to some of the largest technology companies in the world.

**E.     Meta and Snap Misrepresent the Addictive Design of Their Social Media Products**

100.    In addition to not warning consumers and concerned parents, Meta and Snap affirmatively misrepresented the addictive and harmful design and operation of their social media products.

101.    Meta and Snap actively concealed the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

102.    Meta and Snap have represented to the public and governments around the world that their products are safe and not addictive.

103.    During the relevant time period, Meta and Snap stated in public comments that their products are not addictive and were not designed to be addictive. Meta and Snap knew or should have known that those statements were untrue.

104.    During the relevant time period, Meta and Snap advertised via commercials and/or third parties that their products were fun and safe to use, and that they employed their technologies to ensure safe and age-appropriate experiences. Meta and Snap knew or should have known that those statements were untrue.

105.    Meta and Snap  did not warn users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

users. On the contrary, they have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

106.    Meta and Snap have denied for years that their products are harmful or addictive while, in fact, their products *are* harmful and addictive. Meta and Snap knew the truth and chose to conceal it and not disclose to the public or parents of young users, as they knew that such disclosure would prevent them from further growth and development of these products and product features.

**F.    Young Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

107.    The human brain is still developing during adolescence in ways consistent with the demonstrated psychosocial immaturity of adolescents. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

108.    The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

109.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

110.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

111.    Various products features (including but not limited to the recommendation technologies and hidden rewards) Meta and Snap program, utilize, and distribute as part of their social media products are designed to exploit young users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Meta and Snap know or should know that because their youngest users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are therefore much more likely to become addicted to Meta and Snap's products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters.

112.    Meta and Snap also know that young users of their social media products are much more likely to sustain serious physical and psychological harm through their social

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

media use than adult users. Nevertheless, Meta and Snap knowingly design their social media products to be addictive to young users and fail to include safeguards to account for and ameliorate the psychosocial immaturity of those users.

**G.    Meta and Snap's Social Media Products are Products**

113.    Meta and Snap's social media products and features are designed to be used by minors and are actively marketed and distributed to minors in the State of Connecticut. Meta and Snap markets to minors through its own marketing efforts and design. But also, it works with and actively encourages advertisers to create ads targeted that appeal to children and teens.

114.    Meta and Snap spend millions of dollars researching, analyzing, and experimenting with young children to find ways to make their products more appealing and addictive to these age groups, which are seen by Meta and Snap as key to profitability and market dominance.

115.    Meta and Snap are aware that large numbers of children under the age of 18 use their Facebook, Instagram, and Snapchat products without parental consent. They design their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

116.    Meta and Snap are aware that large numbers of children under the age of 13 use their Facebook, Instagram, and Snapchat products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

117.    In fact, Defendant Meta has <u>actual knowledge</u> as to the age of each user, irrespective of what age a user states when opening an account. Meta obtains this knowledge

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

through its extensive collection of user and device data, which includes information relating to on and off-platform activities, as well as other types of data Meta is collecting without its user's actual knowledge. Meta also has developed and employs technologies that estimate with reasonable certainty each user's actual age and utilizes those technologies to its own benefit, *i.e.* in connection with marketing and advertising, while ignoring the same data when it comes to ensuring that it does not provide access to its product to minors.

118.    Meta and Snap have patented several aspects of their technologies and Facebook, Instagram, and Snapchat product features.  For example, Meta has patented its Newsfeed product, *see* U.S. Patent No. 8,171,128, "Communicating a newsfeed of media content on a member's interactions in a social network environment" (filed August 11, 2006, granted May 1, 2012). The patent "describes keeping a profile of each person on the social network in a database, identifying relationships between said users, generating 'stories' based on the connections, and then creating a News Feed for each user."[31] Snap likewise patents certain of its social media technologies, including but not limited to its emphemeral messaging product,

---

[31] *See* https://www.zdnet.com/article/facebook-patents-the-news-feed/; *see also, e.g.* https://info.ipvisioninc.com/blog/4-creepy-facebook-patents-that-are-actually-real (discusses various, invasive social media products for which Meta has obtained patents, which Meta may or may not be using on its users – which information is known only to Meta); https://www.forbes.com/sites/nicolemartin1/2018/11/20/facebook-files-algorithm-patent-to-predict-who-you-live-with/?sh=3b987fe73544 (discussing Facebook patent application to use algorithms to determine who lives in the same household).

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

Content delivery network for ephemeral objects
**Patent number:** 9237202
**Abstract:** A computer implemented method includes receiving an object scheduled for automatic deletion after a specified viewing period, a specified number of views or a specified period of time. Object push criteria are evaluated. The object is pushed to an edge server cache in response to evaluating. The object is served in response to a request for the object.
**Type:** Grant
**Filed:** October 8, 2014
**Date of Patent:** January 12, 2016
**Assignee:** Snapchat, Inc.
**Inventor:** Timothy Sehn

119.    Defendants Meta and Snap also refer extensively to their products and product features as products.

**H.    Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

120.    Plaintiffs seek to hold Meta and Snap accountable for their own acts and omissions.

121.    Plaintiffs' claims arise from Meta and Snap's status as designer, marketer, distributor, and operator of dangerously defective social media products, as well as Meta and Snap's own statements and actions, not as the speaker or publisher of third-party content.

122.    Meta and Snap designed and have progressively modified their products to promote problematic and excessive use, particularly as among children, teens, and young adults, which Meta and Snap know to be indicative of addictive and self-destructive use. Meta and Snap design their product features to be addictive and harmful in themselves, without regard to any content that may exist on their platforms.

123.    Meta and Snap's products are designed to and do addict users on a content neutral basis.

124.    The structure of Meta and Snap's social media products and technologies are, standing alone, harmful to users irrespective of content. For example, Meta and Snap

49

program their algorithm designs to first determine individual user preferences so that they can then influence user behavior and choices once the user is hooked—which is particularly dangerous in the case of teens. On a content neutral basis, the manipulation and control Defendants knowingly wield over their users is profoundly dangerous.

125.    Meta and Snap also have designed product features that encourage and assist children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of these products.

126.    Meta and Snap also affirmatively promote, encourage, and/or otherwise contribute to the development of harmful content. In an October 2021 Senate Hearing it was revealed that Meta documents provided by the Facebook whistleblower demonstrate that Defendant Meta promotes, encourages, and/or otherwise contributes to the development of harmful content. The Senate hearing revealed that,

  a. Meta approves of ads that contain harmful content, for example, "designed to encourage and promote anorexia" and encourage children to abuse prescription or illegal drugs, which ads Meta then targets specifically at children in exchange for payment;

  b. Meta utilizes private information of its young users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Meta specifically selects and pushes this harmful content, for which it is paid, to increase user engagement. "That's how Meta can push teens into darker and darker places." (Senator Blumenthal, October 5, 2022); and

  c. Meta "knows that its amplification algorithms, things like engagement based ranking … can lead children from very innocuous topics like

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

> healthy recipes … all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."

127.    Again, Plaintiffs have less evidence relating to Snap's products and operational decisions on these specific topics, for the sole reason that Defendant Snap is operating with no transparency. Plaintiffs allege that similar evidence likely will be found through discovery in this case.

128.    Meta and Snap are responsible for these harms, which are caused by Meta and Snap's designs and business decisions, and not any single incident of third-party content or even collection of third-party content. In fact, Meta has studied and observed, at least in some contexts, harms caused by the volume of certain subject matters Meta chooses to program its technologies to aim at its users, rather than the content itself. Meta has likewise studied and acknowledged the harms technologies operated by both Meta and Snap cause to young users.

129.    Children like C.O. are being harmed by Meta and Snap's products, marketing and misrepresentations, programming, and decisions to expose teens and children to harmful product features and users. At least in Meta's case, leadership has actual knowledge of the harms it is causing, has been told by employees that it is causing these harms and how to stop causing them (via quick and efficient product changes), and chose to stay the course regardless and for the simple reason that they think that they will get away with it. Plaintiffs allege actual knowledge by Snap leadership as well.

130.    C.O. and children like her do not open social media accounts in the hopes of becoming addicted, sleep deprived, anxious, and depressed. Nonetheless, such children *do* become addicted, and sleep deprived, leading them to engage in foreseeable addict behaviors and to suffer from foreseeable addiction-related harms.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

131.    C.O. and children like her do not start using social media in the hopes of being exposed to product features that cause harm to them. Yet the use of Facebook Instagram, and Snapchat involve harmful forms of social comparison and inevitably push such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, self-harm, and suicidality—harms Meta acknowledges *in its own documents* as being caused and/or worsened by use of these social media products. These are findings the American public had a right to know, while Meta and Snap have concealed them for years for its their own gain and competitive advantage.

132.    C.O. and children like her do not open social media accounts in the hopes of being targeted and exploited by predatory, adult users and by Meta and Snap themselves. They do not know that they will be essentially trafficked by Meta and Snap's algorithms the moment they open an account, exposed to danger and, in the case of young female users, inundated with solication and exploitation attempts as direct result of Meta and Snap sharing their information, location, and/or vulnerabilities to other, adult users in an attempt to profit. Yet Meta and Snap have covertly designed and program their products to do just that – to identify and connect predators with new, potential victims based on an AI assessment and sharing of personal information Meta and Snap collected from these minors without their parents' knowledge or consent.  What Meta and Snap are doing is criminal.

133.    None of Plaintiffs' Claims for Relief set forth herein treat Meta or Snap as a speaker or publisher of content by third parties. Plaintiffs seek to hold Meta and Snap liable for their own speech and their own silence in failing to warn users and parents of the foreseeable dangers (foreseeable to Meta and Snap only) arising from anticipated use of their social media products.  Defendants marketed those products as safe, and purposefully did not disclose the actual harms their products were causing – which were far more nefarious and

52

catastrophic than any consumer or parent had any reason to suspect. In short, no matter what else the public may have known about the risks of too much screen time, these products—marketed, sold, distributed, and programmed by Meta and Snap—are something else entirely.

134.   Meta and Snap could have manifestly fulfilled their legal duty to design reasonably safe social media products and could have furnished adequate warnings of foreseeable dangers arising out of the use of their products to users and parents without altering, deleting, or modifying the content of a single third-party post or communication. Meta and Snap simply chose to not do so, despite knowledge that thousands, if not millions, of American teens and children were suffering as result.

**I.**     **Defendants Meta and Snap Directly and Proximately Caused Harms to Plaintiffs, including the Aiding and Abetting of Defendants Sharp and Rodriguez, Who Caused Additional Harms to C.O. in 2019 and 2021**

135.   C.O. is currently 15 years old.

136.   She was a happy and outgoing child, who always enjoyed school and spending time with her family and friends.

137.   C.O. opened Facebook, Instagram, and Snapchat accounts without her parents' knowledge or consent, keeping her use of those products secret as long as possible.

138.   C.O. recalls being 10 when she opened her first Facebook and Instagram accounts (which she opened and accessed via the iPad she received for her tenth birthday) and 12 when she opened her first Snapchat account.

139.   C.O.'s parents, V.V. and E.Q., did not grow up with social media and did not have any accounts outside of a single Facebook that they used on occasion to stay in touch with family. They did not know much about Facebook, and their own experiences on Facebook were benign; and they knew nothing about Instagram or Snapchat. They did not

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

know that C.O. would be able to access these products on her iPad, and did not know that the manufacturers and distributors of these products could provide access to children without some form of age verification and/or parental consent. Social media was not a part of their world, and they had no reason to think that their underage daughter was accessing and using these apps in their own home as often as she could – but she was, and the fact of her use (and increasingly problematic use at that) was known only to C.O. and these defendants.

140. In addition to not verifying age and parental consent, Defendants Meta and Snap allow and encourage young users to open multiple accounts.

141. Minors often open secondary accounts to hide use from parents, which secret accounts are called FINSTAs (Fake Instagram) or SPAM accounts.

142. Snap's terms of service purport to prohibit multiple, personal accounts; however, Snap has chosen to not utilize its available technologies to enforce these terms. Instead, Snap allows minors to open multiple accounts without their parents' knowledge or consent. This failure to enforce its terms – despite the ability to do so – also means that predators open multiple accounts for nefarious purposes, *i.e.* pretending to be someone they are not, harassing minors, and continuing in harmful, even illegal, activities.

143. Instagram's terms of service do not prohibit multiple accounts. Instead, Meta leadership has leaned into this inherently dangerous aspect of its social media products, which they recognize as a potential source of increased revenue, *i.e.* if kids can open multiple accounts then they are likely to spend more time on Instagram and if a parent does not know that a secret, secondary account exists then they have no way to monitor that account and cannot make their child close it for the simple reason that they do not know it exists.

144. In fact, in 2016, Meta implemented a product feature allowing users to switch between multiple accounts at the click of a button, without having to log out and log back

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

in. This made it easier for kids to open multiple accounts without getting caught. Meta views kids opening multiple (secret) accounts as a "unique value proposition," and actively campaigns to ensure that every teen knows that this option is available to them,

> [Meta] saw teens creating secret accounts that are often hidden from their parents as unique value proposition. In their words, a unique value proposition. A way to drive out numbers for advertisers and shareholders at the expense of safety, and it doubled down on targeting children pushing products on pre-teens not just teens, but pre-teens that it knows are harmful to our kids' mental health and wellbeing.[32]

145.    C.O. eventually opened multiple Instagram and Snapchat accounts, such that, when her parents *did* eventually realize that she was using these products and *were* able to take affirmative steps to try to stop her from using them, she could simply open new accounts. Meta and Snap's design, distribution, and operational decisions enabled and aided her in the opening of multiple accounts, and also ensured that her parents had no means of ascertaining how many accounts she had opened or her usernames.

146.    C.O. does not recall the exact number of accounts she opened, as there were many. She knows that she opened several on Instagram, and three or four on Snapchat.

147.    Meta and Snap do not verify phone numbers, emails, or other information users provide, making it easier for underage users to open accounts and to lie about their age when opening accounts (and likewise, encouraging predatory users by making it easier for them to harm other users with anonymity and impunity).

148.    Minor users and predatory users are able to enter nonsense emails and open email accounts for the sole purpose of opening new Meta and Snap accounts, which accounts

---

[32] Statements from Senator Blumenthal made during Frances Haugen testimony before the Senate on October 5, 2021, at 04:09, https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript. Senator Blumenthal's office was provided with copies of internal Meta documents.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

are not verified by Meta or Snap. Their failure to verify encourages predatory users, and makes it easier for underage and/or unauthorized users to use their product.

149.    Defendants Meta and Snap also have chosen to ignore the provision of inconsistent birthdates across multiple, single user accounts, and otherwise not act when minors publicly disclose the fact that they are underage.

150.    For example, minors frequently enter inconsistent birthdates across multiple accounts. Sometimes this happens for the simple reason that they do not remember what was provided before, because there is no need for them to remember – they know that Meta and Snap are not going to act. While at the same time Meta and Snap know or should know that one or more of these birthdates are false, including because the accounts are linked or linkable via data these defendants collect or otherwise possess, for example, Device ID data (which is unique to each device), user names, location, user provided phone number, email, and a variety of other data points that enable these defendants to identify with reasonable certainty single user multiple account situations. But also, minors frequently disclose their true age in public bios and profiles, in Snaps, public posts, Stories, and comments; open accounts with school issued emails (elementary schools); access accounts from school issued devices; publicly post about school, school events, and classmates; and post photos and videos making it abundantly clear that they are under 13.

151.    C.O. created new or fake email accounts for the sole purpose of opening new accounts, and provided inconsistent birthdate information across related accounts, or no birthdate information at all. For this reason, Meta and Snap knew or should have known that C.O. was underage and did not have parental consent to use their products; yet they continued to provide her with account after account, and profited handsomely as a result.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

152.    Meta and Snap also knew or had reason to know that C.O. was underage based on her account activity and data Meta and Snap collect from users and/or otherwise had in their possession, custody, or control.

153.    For example, Meta has proprietary technology that estimates the actual age of each user with reasonable certainty. Meta uses this technology to increase its advertising revenue and for similar purposes, but ignores the information it has with regard to the actual age of its users when it comes to enforcing its own terms and age restrictions.

154.    Meta also had access to photos on C.O.'s device. At one point several photos made it from C.O.'s camera roll to her Instagram account. She does not know how or why those photos were posted, but random users on Instagram (who she did not know and did not want to know) began commenting on her photos. In many of those photos she was only 8 years old, and at the time it happened she was not much older.

155.    Snap likewise knew or should have known from the data it collected, her multiple accounts, activity on those accounts, and other data points in Snap's possession that C.O. was not old enough to be using its social media product and/or lacked parental consent.

156.    At all times relevant, V.V. and E.Q. believed that C.O. was using her iPad for games, kid-appropriate videos, and educational purposes only.  V.V. and E.Q. would never have allowed Facebook or Instagram in their home had they known she was using those apps, and would never have allowed C.O. to open and use her own Snapchat account. V.V. and E.Q. simply did not know enough about these products to be okay with their child using them. At the same time, however, Meta and Snap were designing, distributing, and operating their products in a manner that stripped V.V. and E.Q. of the right to make that choice.

157.    When her parents did eventually learn about her use of these apps, they tried to stop her from using them and, when that failed, they tried to open their own IG and

Kennedy, Johnson, Schwab & Roberge, L.L.C. • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

Snapchat accounts in an effort to monitor and protect their child. Ultimately, however, they could not even figure out how the products worked. They also asked others about the products, and were told that Snapchat was an app where pictures would pop up and you would see the picture and then it would disappear. They understood that Snap was a silly photo app for kids and that it did not connect kids with strangers, that is, it was used by kids to interact with people they already knew; and they understood that Instagram was like Facebook, a product people (especially kids) used to keep in touch with friends and family.

158.    Meta and Snap both also represented that they use their technologies to keep kids safe, and widely advertised their products as fun and safe for kids and families. Had either company been honest about their products and the harms they were causing, V.V. and E.Q. would have taken even stronger steps to stop their child from using these products.

159.    C.O.'s secretive use of Meta and Snap's social media products coincided with a severe and steady decline in C.O.'s mental and physical health.

160.    Shortly after the opening of the Meta and Snap accounts, C.O. began having trouble sleeping and, over time, experienced severe sleep deprivation and related harms such as anxiety, depression, moodiness, and inability to regulate her emotions. The sleep deprivation led to her being tired during the day, anxiety, and uncharacteristic mood swings and emotional reactions. V.V. and E.Q. did not realize that C.O. was staying up late using Defendants Meta and Snap's products, though Meta and Snap did as they track all usage of their products on a per-user basis.

161.    C.O. and her parents also had no reason to suspect that Meta and Snap's social media products, including their marketing, design, programming, and distribution decisions, were causing C.O.'s increased difficulties sleeping, anxiety, and depression. Meta and Snap, however, knew that their products were causing dependency issues and that a significant

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

number of minor users felt that they could not stop using Facebook, Instagram, and Snapchat and to the point where their "problematic use" was intereferring with their education, interpersonal relationships, and ability to sleep, among other things.

162.    In fact, Meta and Snap specifically designed their products to hook young users, utilizing a variety of extended use designs – which designs were known to Meta and Snap, but not ordinary consumers.  The following are just some examples.

163.    Defendants Meta and Snap inundated C.O. with push notifications, which had the intended effect of pulling her back onto their social media products – at the direct expense of C.O.'s health and wellbeing.  C.O. likewise became dependant on Meta and Snap's features, including gamification features and rewards, and often found herself losing track of time while using Defendants' products due to their pull to refresh and endless scroll features.  These are specific product features Defendants' designed, implemented, and distributed to minors, despite knowledge of their potentially harmful effects.

164.    Defendant Meta has known for years that it is harming children and teens through use of these products and Defendant Snap knows or should know, and both could have stopped utilizing push notifications and other product features in connection with young users, like C.O., but opted to stay the course instead.

165.    Meta and Snap also design and program their algorithms to addict young users, including but not limited to the speed of their algorithm.  C.O. would often stay up late or wake up after her parents had gone to bed to use Instagram and Snap.  Even when she knew she needed to sleep and wanted to sleep, she couldn't help herself.

166.    Defendant Meta knows it could make small adjustments to its algorithm that would have a big impact on minor users like C.O.  For example, slowing the speed of its

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

algorithm an hour before bed and keeping that setting in place until morning would have made it easier for C.O. to simply turn off her phone when it was time to go to sleep.

167.    C.O. suffered from severe sleep deprivation, and her dependency on Defendants' products caused significant anxiety, depression, and guilt. C.O. had always been close with her family and had always enjoyed school, but now, using Instagram and Snap were all she wanted to do and she began resenting her parents for trying to stop her.

168.    Shortly after the opening of these accounts, Defendants Meta and Snap also began targeting C.O. with harmful content and advertising, and Defendant Meta made available to her certain product features that were known (at least to Meta) to cause social comparison harms, particularly in teen girls.  As direct and proximate result of Defendants' actions, C.O. experienced increased anxiety and depression, as well as devastating harms to her sense of self and self-esteem.  These harms made her even more vulnerable to outside influences than she otherwise would have been by reason of being a child.

169.    C.O. and her parents had no reason to suspect that Meta and Snap's social media products, including their marketing, design, programming, and distribution decisions, were causing C.O.'s anxiety and depression, and the incredible and myriad harms to her self-esteem and identity that manifested over time.

170.    Meta and Snap, in contrast, knew that they were targeting  C.O. with their content recommendation algorithms, and knew that they were designing and programming these products to prioritize engagement over user safety and wellbeing.  Meta also had actual knowledge of the specific harms those programming decisions, as well as Meta's social comparison features, were having on a substantial number of its teen users and Snap knew or should have known the same as to its own programming and products.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

171.    Meta and Snap flooded C.O. with harmful social comparison content –
content encouraging disordered eating and self-harm, highly sexualized content, and other
content that was not appropriate for a minor user of any age, much less one under 13.  This
was content Meta and Snap were selecting for C.O. not because she wanted it or even looked
for it, but because it was content from which they thought she could not look away.

172.    C.O. also began to suffer harms resulting from Defendant Meta's "like"
product and the volume of health and beauty content Meta programs its Instagram product
to send to young girls, like C.O. Her Explore page often was filled with images beautiful and
skinny models and advertisements for beauty products and weight loss tips – not just a few
of these, but an unlimited feed filled with them, to the point where it was hard to see anything
else. At the same time, and like millions of teens who use Instagram, C.O. worried and
judged herself based on the "Like" button. That is, she would spend hours trying to create
the perfect photo and, once posted, her self-image would rise or fall on how many likes it
received.  C.O. judged herself and believed others were judging her by these Instagram-set
standards, and her self-esteem suffered incredibly as a result.

173.    Shortly after the opening of these accounts, Defendants Meta and Snap also
began actively exposing C.O. to defective and/or inherently dangerous products and features
(such as public profile settings and direct messaging), and even further, trafficking C.O.
through complex and proprietary user recommendation algorithms for their own financial
gain. Meta and Snap designed, programmed, and operated their products in a manner that
actively exposed and connected C.O. to predatory users, had actual knowledge (in the case
of Meta) and knew or should have known (in the case of Snap) the harms their design,
programming, and operational decisions were causing, and stayed the course regardless.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

174.    As the foreseeable, if not inevitable, consequence of Defendant Meta and Snap's marketing, product design, distribution, programming, and operational decisions, C.O. was exploited and raped by multiple predatory users of their social media products – users Meta and Snap connected to C.O. as a means to increase their own engagement.

175.    C.O. and her parents had no reason to know how Meta and Snap were designing, programming, and distributing their products, and no reason to suspect that Meta and Snap were connecting and otherwise trafficking their daughter through complex and proprietary algorithms, profile settings, and other features known and understood only by Meta and Snap.  No one in the world had reason to suspect that this is what these social media companies were doing, but they were and they did – and millions of children like C.O. have suffered devastating mental, emotional, and physical harms as a result.

176.    Meta and Snap's algorithms, as currently designed, developed, programmed, and operated by them, suffer from algorithmic discrimination. That is, their product-related decisions are disproportionately harming certain protected classes of users – in this case, young girls – as compared to their male and adult counterparts.  Defendant Meta has actual knowledge of it algorithmic discrimination while Defendant Snap knows or should know.

177.    C.O.'s experiences with Snap illustrate this point: that is, when C.O. first started using Snapchat she did not have her own account.  She used her grandmother and aunt's accounts and when Snap's product thought she was an adult woman it operated as advertised – that is, C.O. had fun messing around with goofy photo filters, added friends she knew in real life, and exchanged silly Snaps with them to pass the time.  On those accounts, she was not approached by strangers, no one attempted to exploit or abuse her, and no one sent her explicit Snaps and messages.  When C.O. opened her own account, however, everything changed.  The product Snap provided to C.O. when it identified her as a teen or

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

tween girl was very different from (and far more harmful than) the product Snap provided to C.O. when it believed that she was an adult woman and that it provided to her male counterparts whom it knew were boys. This product—the one Snap provides to a significant number of young female users—was inherently dangerous and exploitative.

178.    Shortly after she opened her own Snapchat account, C.O. also began struggling in school. Her grades began slipping, and her personality changed. Her parents learned after the fact that, in addition to the harms caused by sleep deprivation and dependency on Defendants' products, kids were bullying C.O. through the group chat and other direct messaging features Instagram and Snap make available in their products to minor users.  These incidents, however, were far worse than any traditional form of bullying her parents may have witnessed or experienced *because* of the product features Meta and Snap made available to her, and inherent defects in the same, as well as C.O.'s addiction to their products. That is, Meta and Snap provided other users with unfetted access to C.O.  If she blocked one user account, the bully could simply open five more and start direct messaging her that way. With no controls or system settings to prevent other users from contacting C.O. directly, she had no way to protect herself from other users.  Likewise, because Meta and Snap were providing her with secret and unauthorized access, she felt like she could not turn to her parents or any adult for help.

179.    C.O. also could not stop using Instagram and Snapchat no matter how bad those products made her feel, or how much others bullied and abused her. That is one of the most dangerous aspects of Defendants' extended use design features and mechanisms when it comes to kids, and Defendant Meta (and Snap on information and belief) have studied this issue and have actual knowledge that a significant number of young users feel as though

63

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

they cannot stop using the Facebook, Instagram, and Snapchat products even when they no longer enjoy that use and even when they want to stop.

180.    C.O. became overwhelmed and angry as a direct result of Meta and Snap's products and product features and the harms those were causing her; and she was only 12 years old. She was not even old enough to be using Defendants' social media products and had Defendant Meta and Snap made an reasonable or actual effort to prevent underage users from using their products, she would not have suffered these harms—addiction, sleep deprivation, anxiety, depression, and bullying—at all.

181.    Meta and Snap deceived, manipulated, and exploited C.O. as a matter of product marketing, design, distribution, and programming.  These were business decisions Meta and Snap made knowing (or having reason to know) that they were creating significant and foreseeable risk of exploitation, abuse, and even rape – which is precisely what happened to C.O.

182.    Through Meta and Snap's public profile features, C.O.'s profile was made viewable and available to complete strangers (including adults) also using Meta and Snap's products. The public profile feature does not serve any communication or utility purpose, but rather, it is a product feature that increases Meta and Snap's engagement exponentially and including by connecting users to one another. It is also inherently dangerous in the case of minors, as it exposes children and teens to predators.

183.    These product settings are even more invasive and dangerous when combined with Meta and Snap's direct messaging products, described above, as they expose minor users to predators. This is like a phone company deciding to publish your child's name, age, and photograph to every stranger within a 50 mile radius and then giving those strangers your child's phone number, but also designing the phone and messaging apps so that any

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

contact your child receives from a stranger disappears and/or cannot be monitored by you. Needless to say, this design would be defective and inherently dangerous, and the phone company would be shut down in short order for committing such gross violations of both childrens' privacy and parental rights to protect and care for children.

184.     In the case of Meta and Snap, however, these companies do it anyway—and are making a fortune distributing information posted by minor users to complete strangers.

185.     Meta and Snap's inherently dangerous user recommendation systems—known as "People You May Know (PYMK)" on Facebook, "Suggestions for You" on Instagram, and "Quick Add" on Snapchat—also immediately began recommending C.O. to adult Meta and Snap users, and encouraged those complete strangers reach out and try to connect with C.O. (and vice versa). Meta studied this type of recommendation algorithm and concluded that "In the past, [it] contributed up to 75% of all inappropriate adult-minor contact."[33] Yet Meta *still* utilizes this product in its Facebook and Instagram products, at least in part, because it knows that connecting more users (including the connecting of adults to children) increases its retention rate and helps it lock-in new users. Moreover, Defendant Snap has gamified its platform to actually incentive and encourage children to accept the recommendsations Snap makes. For example, a user's Snap score – a matter of social prestige and pressure among minors – goes up with each new connection accepted and the Snapchat product previously allowed and encouraged minors to accept all Quick Add requests via a single click of a button. Snap and Meta have designed their products to not only make these connections, but to ensure that their youngest users accept them.

186.     This is just one more example of Defendants Meta and Snap prioritizing engagement over the safety of its youngest users.  Their design, implementation, and

---

[33] *See* <u>Exhibit A</u>.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

programming of these user recommendation algorithms in connection with minor accounts directly and proximately caused harm to C.O. and her family. Moreover, C.O.'s experiences with these products are proof that both of these defendants are operating their social media products with some degree of algorithmic discrimination. C.O. was never targeted when she used accounts Snap believed were operated by adults, nor were her male counterparts were targeted in this manner. And the same is true for Instagram.

187.    As soon as she opened her Instagram account, strangers began finding C.O. through Meta's "Suggestions for You" feature and then would try to add her and/or would send her direct messages to connect. Many of these were adult males C.O. did not know and had no reason to know in real life. They were, instead, individuals Meta selected via its user recommendation algorithms based on how Meta programmed those algorithms—which was to prioritize engagement over safety, even if the result was to find and provide predators with the contact information for and access to minors.

188.    When C.O. was only 10 or 11 years old, Meta directed and connected her to one such predator—a user who's real identity is still unknown. This Instagram predator seemed harmless at first, but his messages quickly turned explicit and he coerced C.O. into sending him explicit photos of herself. This was something that she couldn't tell her parents about, especially because they did not know about her use of Instagram.

189.    When C.O. tried to stop talking to this Instagram predator, he threatened to upload the photos to an internet site unless she continued to engage with him and sent him more photos. C.O. was terrified of her parents finding out, and of her photos being published online, so she sent him more explicit photos. C.O. felt trapped, and in December of 2018, she tried to commit suicide in the hopes of finding some escape.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

190. Her family did not know the reason behind her suicide attempt at the time, because C.O. was still afraid to tell them the truth; and when she finally did, they attempted to report the exploitation to the police, who informed them that Meta's Instagram product was designed in such a way that they could not identify who was behind the Instagram account that was used to abuse her, and a case was never opened.

191. Through this incident, V.V. and E.Q. learned that C.O. was using the Instagram social media product, and attempted to exercise their parental authority to prevent such use and distribution by Meta to their child. V.V. and E.Q. made clear that C.O. was not allowed to use Instagram and, when that did not work, took away her electronic devices to physically prevent such use. The problem is that stopping children from having access to a wi-fi enabled device is almost impossible, and creates entirely different problems–for example, not being able to reach people when needed, not being able to complete schoolwork or even participate in certain friend and/or school activities and, particularly once the pandemic started in early 2020, complete isolation from the world.

192. V.V. and E.Q. noticed that when C.O. did not have access to electronic devices, she began to get better. She began sleeping better, and seemed happier. She would engage with her family, and participate, and was less anxious. Unfortunately, however, they were unable to prevent C.O. from using electronic devices indefinitely, and as soon as she was able to gain access again, she began using Defendant Meta and Snap's social media products. That is what engineered addiction does to young users—it leaves them no choice.

193. Over time, when V.V. and E.Q. tried to restrict C.O.'s access to these social media products, she started running away. C.O. knew that Meta and Snap would provide her with access to their products on any device she could find, did not require parental consent

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

or permission, and did not care how she accessed their products as long as she did. So when her parents said no device, C.O. would take off and gain access through a friend.

194.    When C.O. was 12 she got her first cell phone, which her parents wanted her to have in case she needed to reach them. But also, V.V. and E.Q. thought that they would be able to better monitor what she was doing with a phone. Specifically, they told her no social media apps, and checked her phone every day at first to make sure none were being used. On a few occasions, they found a social media app and immediately deleted it. Over time, however, C.O. appeared to stop trying as they no longer found any evidence of social media use on her phone. Feeling more secure, V.V. and E.Q. eventually started checking every other day instead of every day, and then the time between checks increased.

195.    What V.V. and E.Q. did not know was that C.O. was accessing Meta and Snap products through other means, and was even downloading their products onto her device in ways designed to evade detection. For example, she would download the app after her parents were asleep or after she left for school, and delete it before her parents woke up or before she got home from school.  This incessant downloading of an app onto a device is presumably a form of distribution Meta and Snap could prevent, but they don't; and many underage and unauthorized users employ this method to hide their social media use from their parents (to Snap and Meta's financial benefit).

196.    When C.O. first started being targeted by Snap's algorithms – that is, when Snap began publicizing and directing her information to predators because of her age and gender and when Snap began connecting these predators to her via its Quick Add feature – C.O. tried to obtain help via Snap's purported in-app reporting mechanism.  Snap claims and represents to users that it has a feature where you can screen shot violating chats and send

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

them to Snap. Snap represents that if someone is harassing you then you can report them and Snap will take action. Only Snap never took action to protect C.O. despite her request.

197.    After C.O. opened her own Snapchat account (instead of using the one belonging to her grandmother and aunt), complete strangers started sending her dick pics. The way the Snap product is designed, she could not see what the image was until opening it, and then it was too late – she was exposed to numerous explicit photos in this manner, none of which were photos she wanted to see. So when this first started happening, C.O. reported these incidents to Snap. She reported them via every option Snap provided, telling Snap that these users were people she did not know and were harassing her. She sent in the explicit photos and every single time Snap did nothing in response. On the contrary, often a single user would continue sending her photo after photo; and she would report photo after photo, but again, Snap did not email her back or respond or ban the violating users. Nothing happened, and C.O. realized that she was on her own and Snap was not going to help.

198.    Then, on July 15, 2019, when C.O. was still only 12 years old, Snap directed and connected her to Defendant Reginald Sharp.

199.    C.O. did not know Sharp in real life and Snap directed him to her via its algorithms—its Quick Add and/or Public Profile features, or both. Sharp was a registered sex offender, and went by the username **JASONMORGAN5660**.

200.    After Snap identified and connected C.O. to Sharp, he quickly began engaging C.O. in sexually explicit communications, and promised her money in exchange for sending him explicit photographs or meeting in person. C.O. was only 13, and Sharp gained access to her through and because of Snap's product features, which Snap knowingly and deliberately made available to minor users to increase Snap's own revenue.

69

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

201.    After C.O. sent Sharp explicit photographs, he threatened to post those on Snapchat unless she had sex with him. C.O. was 13 and Sharp knew she was 13.  On July 23, 2019, Sharp coerced C.O. into sneaking out of her home in the middle of the night to meet him and, when she met him, he raped her.

202.    C.O.'s mother knew something was wrong immediately the next morning, found out what had happened, and reported it to the police who investigated.

203.    Even though Sharp did not use his real name in connection with his Snapchat account—he used the name Jason Morgan—the investigating detectives (who had none of his personal information) were able to determine his true identity and his status as a registered sex offender quickly.

> The analysis shows "JASONMORGAN5660" was the snapchat username communicating with V1.  From the analysis Detective ▮▮▮▮▮▮ was able to locate another Jason Morgan on the social media platform "Facebook". The "Facebook" name "Jason Morgan" had several photographs and videos that were open without any privacy settings.   The "Facebook" username also had an open, not private "friends" list. By evaluating the "friends" list we were able to develop a possible suspect, Reginald Sharp (DOB 03/13/1985) 34 years old.

204.    Detectives also quickly confirmed everything C.O. had told them about what happened to her on Snapchat,

> Police Department and a departmental consent to search form was completed.  The victim's cellular phone was turned over to the ▮▮▮▮▮▮Police Department Computer Forensics Unit for analysis.  The analysis of the cellular phone showed that Snap Chat user "JASONMORGAN5660" initiated a conversation with the victim on July 15, 2019.  JASONMORGAN5660 and the victim exchanged their ages; victim told JASONMORGAN5660 that she was 12 years old.  The victim exchanged photographs with the suspect, including nude photos and videos, which the victim deleted.  The conversations between the victim and Sharp became sexually explicit to the point where Sharp enticed the victim with money and drugs for sexual acts.  Affiant ▮▮▮▮▮knows from training and experience that individuals involved in human trafficking will often manipulate or "groom" their victims by telling victims "I will take care of you" and promise to provide them with money and/or drugs.  Sharp sent the victim numerous voice messages over Snap Chat asking to meet the victim and provide her with money and/or drugs.
>
> Additionally, at one point during the conversation Sharp asked the victim if he could "nut" inside of her, meaning ejaculate inside of her.  When the victim expresses concern of becoming pregnant, Sharp told her he would take care of the baby until she is older.  Sharp also asked the victim if she would be his "lil" girlfriend and told her how having sex with him would help make sexual intercourse with her boyfriend better because it would not hurt after she had intercourse four to five times.  At times during this conversation exchange Sharp becomes angry and frustrated with the victim when she does not meet his demands of meeting him for sexual intercourse.  Sharp was able to convince the victim to meet him through manipulation and guilt.

And they presented Snap with both a preservation notice and search warrant, identifying the predatory Snapchat user who, according to Snap, still had an active account,

70



On 07/23/2019, I, Detective███████ report that Snapchat responded to the preservation request and advised the account of "JASONMORGAN5660" is active and is now preserved under case #███████████
A search warrant for the Snap Chat account was completed based on the following facts and circumstances:

On July 23, 2019 at approximately 2:08 P.M. Detective███████ and Detective███████resented a Search and Seizure Warrant for any and all subscriber information associated with the Snap Chat username "JASONMORGAN5660" to the Honorable Judge█████at ███████Superior Court. Judge█████reviewed and approved the Search Warrant. Detective███████served the Search Warrant on Snap Chat. Results are pending.

205.    Detectives identified the Snapchat predator as Reginald Sharp. Despite the fact that Defendant Reginald Sharp is a registered sex offender, and despite the fact that Snapchat connected him with a 13 year old child who he then raped and that Snap knows or has reason to know that he is using its product to rape (possibly even traffick) young girls and that is product is affirmatively helped him find those young girls, Defendant Sharp's Snapchat account *appears* to still be active on the Snapchat platform (last viewed on Saturday, December 10, 2022 – more than three years after his arrest),

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077



**Jason Morgan**
jasonmorgan5660

**+ Add Friend**

206.     Snap connected C.O. to numerous predatory users, because those connections were ones Snap decided (via its algorithm programming) as being in Snap's best interest. Snap directed and connected countless predators to C.O., from the moment she stopped using her aunt and grandmother's Snapchat accounts and opened her own.

207.     In October of 2021, when C.O. was only 14, Snap connected her to another predator who also met with her in person and sexually assaulted her. By that time, her parents knew she was using the Snapchat product and did everything they could to stop her – but ultimately, there was no way to prevent such use short of locking C.O. in her room with no

access to any electronic devices and eyes' on monitoring 24/7. That is how Meta and Snap design their products – to ensure that there is nothing parents can do.

208.    V.V. and E.Q. monitored C.O.'s phone. They did not allow her to use social media, but also could not physically stop her from leaving when they took it away. Eventually, knowing that if she did not have social media access she would leave, E.Q. began sleeping on the bathroom floor and in other locations where he thought he might be able to hear her if she tried to sneak out. Ultimately, however, she got past him.

209.    One of the predators Snapchat connected to C.O. in October of 2021 (via its Quick Add product) was Defendant "Eddie" Rodriguez, a former police officer and a registered sex offender. Defendant Rodriguez used the access Snapchat provided to him to obtain her phone number and address, and thereafter began to exchang explicit messages and photos. Then Rodriguez convinced C.O. to meet him in-person before school, which she did. He offered her a ride to school, but when C.O. got into his car, Defendant Rodriguez sexually assaulted her.

210.    C.O. became anxious and overwhelmed as a direct result of Meta and Snap's products and product features and the harms those were causing her. According to Snap's terms of service, it would not distribute its product to her if she was under 18 and without parental consent; however, she was under 18 and her parents did not consent. Snap distributed its product to her anyway, and had Snap made a reasonable or actual effort to enforce its terms in this regard, C.O. would not have suffered these harms—addiction, sleep deprivation, anxiety, depression, bullying, sexual assault, exploitation, trafficking, coercion to engage in commercial sex acts, and the myriad of resulting and long-term mental and emotional harms—at all.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

211.     C.O. has suffered serious mental, emotional, and physical harms as direct and proximate result of Meta and Snap's marketing, design, distribution, and programming decisions. Meta and Snap have profited handsomely from her use of their products, while simultaneously taking from C.O. the majority of her child hood and jeopardizing her future.

212.     Meta and Snap did not warn C.O. or her parents of any of the harms their products might cause; indeed, Meta and Snap did not warn anyone, despite their own findings and realizations that their products were harming young users, like C.O.

213.     C.O. began using Meta and Snap's social media products because she did not feel like she had a choice. At 10 years old, it seemed like all of her peers were using these products, and everyone knew that Meta and Snap did not care how old you were. They would let you use their products and would not stop you from using them even if your photos, bio, statements, and/or activity made it clear that you were a kid.

214.     C.O. hid her use from her parents, which she was able to do so because Meta and Snap make no reasonable or actual effort to verify age or identity. C.O. recalls opening at least some accounts where Defendant Snap did not even ask her age, while Defendant Meta did not care what age she put down, and allowed her to use whatever age she wanted across otherwise connected accounts, i.e. accounts she accessed via the same device and for which she most likely used some of the same identifying information.

215.     Sometimes when C.O. was struggling and felt like she might feel better if she could just stop using Instagram and Snapchat, she would delete her account. Eventually, and after certain incidents of exploitation and abuse, she kept her Instagram account closed. But she had a more difficult time keeping her Snapchat account closed, and would often close her account then re-open when she felt like she couldn't live without Snapchat anymore.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

216.    Again, across these multiple accounts she would use some variation of her first name in her username, she would use her same devices to access these accounts, and she would list her same phone number to open these accounts.

217.    C.O. has been hospitalized and in counseling because of the harms Meta and Snap caused her; she has isolated herself socially; she has suffered from anxiety and depression, thoughts of self-harm and suicide; and tremendous pain and guilt for what her dependency on these products and her inability to just stop using them has caused her family. She recalls times when her father would sleep on the bathroom floor to try to stop her from running away, and she would find another way out of their apartment. She recalls times when she would lie to her friends or even the police and authorities, in an attempt evade her parent's control of her access to social media.  In the moment, she felt like she would do anything to just be left alone, but she always regretted it after and felt guilty and ashamed of what she put her parents and family through—all because she felt like she needed these products and could not live without them.

218.    If C.O. had known, she would not have used Facebook, Instagram, or Snapchat. She would have deleted all social media apps, and she would have waited until she was older and better equipped to protect herself from the harms those products cause before even trying to use Meta and Snap's social media products.

219.    But Meta and Snap never told her that these were the risks she faced if she used their products. Meta and Snap at some point knew exactly what they were doing, and stayed silent regardless – and C.O. and her family were severely harmed as a result.

## COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

220.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if full set forth herein.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

221.    Under Restatement (Second) of Torts § 402(a) and Connecticut General Statutes §§ 52-572m, *et seq.*, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

222.    Defendants' products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the condition, and its defective condition was a cause of Plaintiffs' injuries.

223.    Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

224.    Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

225.    Defendants' products were unreasonably dangerous because they contain no effectual reporting mechanisms, or other means to ensure user safety, despite the incredible and inherent dangers they pose to minor users.

### A. Inadequate Safeguards From Harmful and Exploitative Content

226.    Snapchat and Instagram are defectively designed.

227.    As designed Snapchat and Instagram's recommendation and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not direct minors to harmful content and to do so without altering, modifying, or deleting any third-party content posted on Defendants' social media products. The cost of designing these products to incorporate such safeguards would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

228.    As designed, Snapchat and Instagram recommendations and other product features are not reasonably safe because they affirmatively direct and recommend minor users to harmful groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all; it is feasible to design an algorithm and technologies that do not recommend harmful groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Defendants know that these product features cause a

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

significant number of harms to their minor users, such as sexual exploitation, bullying, and encouragement of self-harm and suicide.

229.    Reasonable users (and their parents) would not expect that Defendants' products would knowingly expose them to such risks and dangers and/or that Defendants' products would direct them to harmful users at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users.

**B.    Failure to Verify Minor Users' Age and Identity**

230.    Snapchat and Instagram are defectively designed.

231.    As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

232.    Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

233.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes. Moreover, and as Defendants know, minor users lack the life experience and frontal lobe development necessary to protect themselves from such predators – providing access to these children is an inherently dangerous product mechanic,

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

which dangers are known and have been studied by these defendants but were not otherwise known to the general public.

234.    Minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

235.    But also, predator users who are engaged in illegal, harmful, and/or violating activities also often open multiple accounts, such that Defendants know or have reason to know that the user is engaged in such harmful conduct and/or has violated their terms such that their use of the product is no longer duly authorized. Defendants are encouraging and creating these dangers and enabling these predators through their product features and refusal to enforce their own terms. Defendants also already have the information and means they need to ascertain with reasonable certainty their users' actual age, and when one user has multiple accounts. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, predatory users themselves, to the detriment of other, vulnerable users – including kids, to whom Defendants market and addictively design their products.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

236.    Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only can estimate the age of their users, but they do.

237.    The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products and would discourage the use of said products for exploitation and abuse of minors.

C.    **Provision of Inadequate and Unreasonable Parental Control and Monitoring Products and Processes**

238.    Snapchat and Instagram are defectively designed.

239.    Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

240.    It is feasible to design a social media product that requires parental consent for users under the age of 18 and prohibits users under the age of 13.

241.    Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

242.    Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

**D.    Design of Addictive Social Media Products**

243.    Snapchat and Instagram are defectively designed.

As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection.  In normal stimulatory environments, this dejection abates, and neutrality is restored.   However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use the social media products at issue, not for enjoyment, but simply to feel normal. Once they stop using these products, minor users experience the universal symptoms of withdrawal from an addictive substance including anxiety, irritability, insomnia, and craving.

244.    Addiction is not restricted to substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associate personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

245.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

246.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (1) becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in order to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or causes harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

247.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in order to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

248.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

    a.    You spend a lot of time thinking about social media or planning how to use it.

    b.    You feel an urge to use social media more and more.

    c.    You use social media in order to forget about personal problems.

    d.    You have tried to cut down on the use of social media without success.

    e.    You become restless or troubled if you are prohibited from using social media.

    f.    You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

249.    Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addiction. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM-5 and include:

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

a.   Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

b.   Tolerance, the need to spend more time using social media to satisfy the urge.

c.   Inability to reduce social media usages, unsuccessful attempts to quit using social media.

d.   Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.   Continuing to use social media despite problems.

f.   Deceiving family members or others about the amount of time spent on social media.

g.   The use of social media to relieve negative moods, such as guilt or hopelessness.

h.   and Jeopardized school or work performance or relationships due to social media usage.

250.   Defendants' advertising profits are directly tied to the duration of their users' online time and quantity of engagements, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform.

251.   It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of

84

minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

**E.    Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

252.    Snapchat and Instagram are defectively designed.

253.    Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable.

254.    It is reasonable for parents to expect that social media products that actively promote their platform to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive. It is feasible for Snapchat and Instagram to design a product that identifies a significant percentage of their minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

255.    Likewise, it is feasible for Snapchat and Instagram to design a product that notifies parents when strangers attempt to engage directly with them, and/or otherwise limits the ability to find and access minors on their platforms, absent parental consent.

256.    Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or

85

solicited by an adult user or when a user has sent inappropriate content to minor users or even blocking users known to be engaged in exploitation and abuse because of their products.

257.    Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms and other technologies to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

258.    Moreover, it is reasonable for parents to expect that platforms such as Instagram and Snapchat, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger; and to identify abusive and violating users and block them.

259.    As a proximate result of these dangerous and defective design attributes of Defendants' products, C.O. suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design attributes in Defendants' products prior to 2022.

260.    As a result of these dangerous and defective design attributes of Defendants' products, Plaintiffs suffered emotional distress, physical harms, and pecuniary hardship arising from both their daughter's mental harm and Defendant Meta's refusal to accept and act on their well-documented reports.

261.    Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Snapchat and Instagram.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

## COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

262.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if full set forth herein.

263.    Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold, and were a cause of Plaintiffs' injuries.

264.    Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects and inherent defects of Instagram and Snapchat.

265.    Defendants' social media product rely on highly complex and proprietary algorithms and similar technologies that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

266.    The magnitude of harm from use of Defendants' products is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, sexual exploitation, and suicide.

267.    The harms resulting from minors' addictive use of social media platforms have been not only well-documented in professional and scientific literature, but Defendants had actual knowledge of such harms.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

268.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

269.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost.

270.    It is feasible for Defendants' products to report dangerous and/or harmful events impacting minor users to minor users' parents at negligible cost.

271.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

272.    As a result of Defendants' failure to warn, C.O. suffered mental harm from her use of Instagram and Snapchat.

273.    As a result of Defendants' failure to warn, Plaintiffs suffered emotional distress, physical harm, and pecuniary hardship.

274.    Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram and Snapchat.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

## COUNT III – NEGLIGENCE

275.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if full set forth herein.

276.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such as C.O.

277.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, resulting in a diminished capacity to make good decisions regarding social media usage, eschew self-destructive behaviors, and overcome emotional and psychological harm.

278.    As product manufacturers marketing and selling products to consumers, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and distribution of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

279.    As business owners, Defendants owe their users who visit their social media platforms and from whom they derive billions of dollars per year in revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

280.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like C.O., using their social media products.

281.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants know that their products

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

282.    Defendants were negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

283.    Defendants were negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of their social media products.

284.    Defendants were negligent in failing to provide users and parents the tools to ensure their social media products are used in a limited and safe manner by underage users.

285.    Defendants were negligent in failing to provide users and parents with reasonable and effectual reporting mechanisms, and for failing to enforce their own terms of service upon notice of illegal conduct and/or violations of terms – which failures resulted in harm to other users, including minor users who should not have had access to Defendants' products in the first place.

286.    As a result of Defendants' negligence, C.O. suffered severe mental harm.

287.    As a result of Defendants' negligence, C.O. suffered emotional distress, physical harm, and pecuniary hardship.

288.    Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton conduct toward underage users, whom they knew would be seriously harmed through the use of their social media products.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

## COUNT IV – CONNECTICUT UNFAIR TRADE PRACTICES ACT, C.G.S. §§ 42-110G, ET SEQ. ("CUTPA").

289.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if fully set forth herein.

290.    Plaintiffs bring claims against Defendants Meta and Snap for committing unfair and/or deceptive acts or practices by marketing and representing their products as being safe for minor users when Meta and Snap knew or should have known that their social media products were harmful to a significant percentage of their minoror users yet they failed to redesign their products to limit the potential harms or warn minor users and their parents of the dangers inherent in the foreseeable use of their products.

291.    The unfair and/or deceptive acts or practices of Defendants Meta and Snap were a proximate cause of the harm suffered by the plaintiffs, C.O. and her parents.

292.    As a result of Defendants Meta and Snap's unfair and/or deceptive acts and practices the plaintiffs have sustained an ascertainable loss.

## COUNT V – UNJUST ENRICHMENT

293.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if fully set forth herein.

294.    As a result of Defendants' conduct detailed herein, Defendants received a benefit. Because Defendants' advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram and Snapchat, Defendants benefited directly from Plaintiff's unauthorized use of their products and also from the predatory user (and predatory users in general) enabled and assisted by Defendants' products.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

295.    It would be unjust and inequitable for Defendants to retain the ill-gotten benefits at Plaintiffs' expense, in light of Defendants' acts and omissions described herein.

296.    Accordingly, Plaintiffs seek damages in an amount to be proven at trial.

## COUNT VI – INVASION OF PRIVACY

297.    Plaintiffs reallege each and every allegation contained in the preceding paragraphs 302 as if fully stated herein.

298.    Defendants Meta and Snap intentionally intruded upon Plaintiffs' solitude, seclusion, or private affairs by knowingly designing their product with features that were intended to, and did, frustrate parents' ability to monitor and control their children's social media usage.

299.    These intrusions are highly offensive to a reasonable person, particularly given Meta and Snap's interference with the fundamental right of parenting and its exploitation of children's special vulnerabilities for commercial gain.

300.    Plaintiffs were harmed by Meta and Snap' invasion of privacy, as detailed herein.

301.    Plaintiffs therefore seek compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Meta and S to cease the harmful practices described throughout this complaint

## COUNT VII – NEGLIGENCE

302.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if fully set forth herein.

303.    Through its use of its "Quick Add" feature on Snapchat, defendant Snap began recommending C.O. to adult Snap users, and encouraged those complete strangers

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

reach out and try to connect with C.O. (and vice versa), thereby being enabling and encouraging predators to target and exploit by the minor plaintiff.

304.    The minor plaitniff's injuries, losses and damages, as alleged herein, were caused by the negligence and carelessness of Snap, in one or more of the following ways:

a.  Encouraging adult users to engage with minor users, like C.O, without solicitation;

b.  Failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures;

c.  Failing to take adequate preventative measures to keep minor users free from sexual exploitation, assault, and battery at the hands of adult users;

d.  Permitting adult users to freely interact with minor users of their products when Snap knew, or should have known that minor users were at risk of sexual exploitation, assault, and battery through the use of its products;

e.  Affirmatively connecting minor female users with adult male users thereby increasing the risk that minor users would be sexually exploited, assaulted, or battered;

f.  Failing to establish, maintain and enforce a policy of reporting, investigating, and removing users engaged in sexual misconduct or exploitation; and/or

g.  Failing to recognize the risks that adult users were using Defendants' products to sexually exploit, assault and batter minor users such as C.O.

305.    As a result of Snap's negligence, C.O. was sexually abused and exploited.

306.    As a result of Snap's negligence, C.O. suffered severe mental harm, emotional distress, physical harm, and pecuniary hardship.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • ATTORNEYS AT LAW
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

## <u>COUNT VIII – ASSAULT AND BATTERY</u>

307.   Plaintiffs reallege each of the allegations in the preceding paragraphs as if fully set forth herein.

308.   On July 15, 2019, when C.O. was still only 12 years old, Snap directed and connected her to Defendant Reginald Sharp.

309.   C. O. did not know Sharp in real life and Snap directed him to her via its algorithms—its Quick Add and/or Public Profile features, or both.  Sharp was a registered sex offender, and went by the username **JASONMORGAN5660**.

310.   After Snap identified and connected C.O. to Sharp, he quickly began engaging C.O. in sexually explicit communications, and promised her money in exchange for sending him explicit photographs or meeting in person.  C.O. was only 13, and Sharp gained access to her through and because of Snap's product features, which Snap knowingly and deliberately made available to minor users to increase Snap's own revenue.

311.   After C.O. sent Sharp explicit photographs, he threatened to post those on Snapchat unless she had sex with him. C.O. was 13 and Sharp knew she was 13.  On July 23, 2019, Sharp coerced C.O. into sneaking out of her home in the middle of the night to meet him and, when she met him, he raped her.

312.   As a result of Sharp's sexual assault and battery of her, the minor plaintiff suffered severe mental harm, emotional distress, physical harm, and pecuniary hardship.

## <u>COUNT IX– ASSAULT AND BATTERY</u>

313.   Plaintiffs reallege each of the allegations in the preceding paragraphs as if fully set forth herein.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

314.    In October of 2021, when C.O. was still only 14 years old, Snap directed and connected her (via its Quick Add product) to Defendant "Eddie" Rodriguez, a former police officer and a registered sex offender.

315.    Thereafter, Defendant Rodriguez used the access Snapchat provided to him to obtain C.O.'s phone number and address, subsequently exchanging explicit messages and photos with the minor plaintiff using Snap's platform, even though defendant knew C.O. was a minor.

316.    Then Rodriguez convinced C.O. to meet him in-person before school by offering her a ride to school.  But, when C.O. agreed and got into his car, Defendant Rodriguez sexually assaulted her.

317.    As a result of Rodriguez's sexual assault and battery of her, the minor plaintiff suffered severe mental harm, emotional distress, physical harm, and pecuniary hardship.

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

THE PLAINTIFFS,

BY:_____.

    Michael R. Kennedy, Esq.
    Brendan K. Nelligan, Esq.
    Kennedy, Johnson, Schwab & Roberge, LLC
    555 Long Wharf Drive, 13th Floor
    New Haven, CT  06511
    Phone: (203) 865-8430
    Fax:    (203) 865-5345
    Juris No.: 434045


    Matthew P. Bergman (*pro hac* pending)
    Matt@socialmediavictims.org
    Laura Marquez-Garrett (*pro hac* pending)
    Laura@socialmediavictims.org
    Glenn Draper (*pro hac* pending)
    Glenn@socialmediavictims.org
    Social Media Victims Law Center
    821 Second Avenue, Suite 2100
    Seattle, WA 98104
    Phone: (206) 741-4862
    Fax:    (206) 957-9549

*Kennedy, Johnson, Schwab & Roberge, L.L.C.* • *ATTORNEYS AT LAW*
LONG WHARF MARITIME CENTER • 555 LONG WHARF DRIVE, 13th Floor • NEW HAVEN, CT 06511
FAX (203) 865-5345 • (203) 865-8430 • JURIS NO. 106077

RETURN DATE:    MARCH 7, 2023       :    SUPERIOR COURT

V.V. and E.Q. individually and as next friends
to minor C.O.
       :    J.D. OF FAIRFIELD

VS.       :    AT BRIDGEPORT

META PLATFORMS, INC., formally known as  :
FACEBOOK, INC.; SNAP, INC.,;
SNAPCHAT, LLC; REGIONALD SHARP; and
EDDIE RODRIGUEZ       :    JANUARY 24, 2023

## <u>AD DAMNUM</u>

The plaintiffs claims monetary damages in excess of FIFTEEN THOUSAND

($15,000.00) DOLLARS, exclusive of interest and costs.

THE PLAINTIFFS,

BY:_____.

Michael R. Kennedy, Esq.
Brendan K. Nelligan, Esq.
Kennedy, Johnson, Schwab & Roberge, LLC
555 Long Wharf Drive, 13th Floor
New Haven, CT  06511
Phone: (203) 865-8430 / Fax: (203) 865-5345
Juris No.: 434045

Matthew P. Bergman (*pro hac* pending)
Matt@socialmediavictims.org
Laura Marquez-Garrett (*pro hac* pending)
Laura@socialmediavictims.org
Glenn Draper (*pro hac* pending)
Glenn@socialmediavictims.org
Social Media Victims Law Center
821 Second Avenue, Suite 2100
Seattle, WA 98104
Phone: (206) 741-4862
Fax:    (206) 957-9549

97

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2    Rev. 9-12

STATE OF CONNECTICUT
**SUPERIOR COURT**

First named Plaintiff *(Last, First, Middle Initial)*

**V.V. Individually and as next friend to minor C.O.**

First named Defendant *(Last, First, Middle Initial)*

**META PLATFORMS, INC.**

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 03 |
| | | 04 |
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| **RODRIGUEZ, EDDIE, c/o Hartford Correctional Center, 177 Weston Street, Hartford, CT  06120** | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | 12 | *FOR COURT USE ONLY - File Date* |
| | 13 | |
| | 14 | Docket number |

**CIVIL SUMMONS-Continuation**